# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 23-1238C
(Filed: January 23, 2025)

| | |
|---|---|
| **CHRISTOPHER D. HARKINS,** *et al.,* | ) |
| | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) |
| **UNITED STATES**, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Dale F. Saran*, Dale F. Saran, LLC, Olathe, Kansas, for plaintiffs. With him on the briefs were *Brandon Johnson*, St. Petersburg, FL, *J. Andrew Meyer*, St. Petersburg, FL, and *Barry P. Steinberg*, Kutak Rock LLP, Washington, DC.

*Kyle S. Beckrich*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brian M. Boynton,* Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, and *William J. Grimaldi*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Brian Judge*, Chief, Office of Claims & Litigation, U.S. Coast Guard, Washington, DC, Of Counsel.

## OPINION AND ORDER

***BONILLA, Judge***.

Six current and former United States Coast Guard active-duty personnel—representatives of a putative class—challenge their separations from military service in the fall of 2022 for reportedly failing (or refusing) to receive Coronavirus Disease 2019 (COVID-19) vaccinations.[1] In support, plaintiffs raise a host of complex issues,

---

[1] When initially filed, the named plaintiffs also included two former Coast Guard Reservists. Their claims were voluntarily dismissed after conceding that they were not participating in full-time active duties at the time of their alleged unlawful separations and, thus, did not satisfy the jurisdictional requirements of the Military Pay Act, 37 U.S.C. §§ 204(a)(2) & 206(a)(1). *See Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999) ("[A] member who is serving in part-time reserve duty in a pay

including: whether the service-wide vaccine mandate violated the Emergency Use Product Act, 10 U.S.C. § 1107a, in ordering the Coast Guardsmen to receive an unlicensed, emergency use authorization (EUA) vaccine in the absence of a Presidential informed consent waiver; whether the uniform denial of religious accommodation requests violated the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1; the import and implementation of Congress' rescission of the vaccine mandate through the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (FY 2023 NDAA), Pub. L. 117-263, 136 Stat. 2395, § 525 (2022); the abrupt conversions of the Coast Guardsmen's noticed disciplinary discharges for alleged violations of the Uniform Code of Military Justice (UCMJ) to administrative separations for the convenience of the government; and whether the Coast Guardsmen were improperly denied certain procedural rights associated with their separations (e.g., administrative discharge boards, reenlistment boards, military counsel, separation pay, pre-separation medical treatment).  Citing their unlawful separations, plaintiffs seek retroactive reinstatement with constructive back pay and benefits consistent with the Military Pay Act, 37 U.S.C. § 204.[2]

Like two ships passing in the night, the government steers this litigation in a different direction.  Defendant contests plaintiffs' reliance upon the FY 2023 NDAA upon the ground that the statute is not money-mandating and, thus, outside this Court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491.  Next, defendant argues plaintiffs lack standing to challenge the *type* of COVID-19 vaccine made available by the military in light of their alleged refusals to be administered *any* vaccine.  On this issue, defendant then muddies the waters by proclaiming the EUA vaccines offered were medically interchangeable with U.S. Food and Drug Administration (FDA)-approved vaccines and, thus, should be considered legally equivalent in addressing plaintiffs' challenges.  Defendant further maintains that the Coast Guard properly considered and denied plaintiffs' religious accommodation requests.  Then, seeking to bypass the contours and complexities of the foregoing issues and their entanglement with the initiated—and then suddenly aborted—disciplinary discharge proceedings, defendant relies upon the ultimate basis for each Coast Guardsman's separation from military service: two voluntarily separated and four were administratively discharged for the convenience of the government.  Defendant maintains all were afforded their applicable rights and processes due.

---

billet, or was wrongfully removed from one, has no lawful pay claim against the United States for unattended drills or for unperformed training duty. This is true whether the failure to drill was by election of the member, or by decision of the service involved.") (citations omitted).

[2] Two former Coast Guardsmen (namely, Christopher S. Musgrave and Matthew W. Powers) also initially charged that the decision to revoke and recoup their reenlistment bonuses effected an illegal exaction in violation of the Eighth Amendment to the United States Constitution.  During oral argument, however, counsel conceded that the Coast Guardsmen's rights to retain their reenlistment bonuses went hand-in-hand with the (im)propriety of their separations and resulting military back pay claims rather than serving as stand-alone illegal exaction claims.

Pending before the Court are the named plaintiffs' motion for judgment on the administrative record and defendant's cross-motion to dismiss and for judgment on the administrative record.  For the reasons set forth below, plaintiffs' motion is granted-in-part and denied-in-part, and defendant's cross-motion is conversely denied-in-part and granted-in-part.  The Coast Guardsmen are entitled to varying forms of relief based upon their specific circumstances.

## BACKGROUND

## I.    VACCINE MANDATE

On August 24, 2021, in response to the global pandemic, Secretary of Defense Lloyd J. Austin III issued a COVID-19 vaccine mandate, "direct[ing] the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under [Department of Defense (DOD)] authority on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19."[3]  In issuing this directive, Secretary Austin noted:

> Mandatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance.  Service members voluntarily immunized with a COVID-19 vaccine under FDA Emergency Use Authorization or World Health Organization Emergency Use Listing in accordance with applicable dose requirements prior to, or after, the establishment of this policy are considered fully vaccinated. . . .

*Id.*  Secretary Austin further directed that the mandatory vaccination requirements be implemented consistent with DOD Instruction 6205.02 (July 23, 2019) (DOD Immunization Program), applicable to the Coast Guard by agreement.[4]  In accordance with this instruction, the Coast Guard formally adopted the vaccine mandate two days later in ALCOAST Message 305/21 (Aug. 26, 2021) (Mandating COVID-19 Vaccination for Military Members).

On December 23, 2022, Congress passed, and the President signed into law, the FY 2023 NDAA, directing the Secretary of Defense to rescind the vaccine mandate within thirty days.  Secretary Austin formally rescinded the vaccine mandate on January 10, 2023, highlighting the continuing need to: "promote and encourage

---

[3] *See* https://perma.cc/5HYU-DSJJ (last visited Jan. 21, 2025).

[4] *Id.*  § 1.1(a) notices the applicability of the DOD Instruction to the Coast Guard by agreement of the services.  The Coast Guard operates under the U.S. Department of Homeland Security during peacetime.  During times of war, the maritime security, search and rescue, and law enforcement service branch can be transferred to the U.S. Navy by order of the President or act of Congress.

COVID-19 vaccination for all [s]ervice members" while respecting religious liberty; discontinue separation proceedings based "solely on the basis of [a service member's] refusal to receive the COVID-19 vaccination if they sought an accommodation on religious, administrative, or medical grounds"; consider "individual immunization status of personnel in making deployment, assignment, and other operational decisions, including when vaccination is required for travel to, or entry into, a foreign nation"; and address former service members' applications for administrative relief through discharge and records corrections boards.[5]  The next day, the Coast Guard rescinded its COVID-19 vaccine mandate to align with the DOD.[6]

## II.    RELIGIOUS ACCOMOCATION REQUESTS

During the sixteen months the vaccine mandate was in effect, each branch of the military, including the Coast Guard, set up an administrative process for service members to request a religious accommodation (i.e., exemption or temporary waiver). Coast Guardsmen seeking religious accommodations were asked to submit a written request to the proper approval authority "describ[ing] the specific request the member is seeking and the relation to the sincerely held belief on which it is based." COMDTINST M1000.15 Art. 12(a)–(b).[7]  Coast Guardsmen were required to submit to an interview by their unit's Chaplain using a Religious Accommodation Interview Checklist scripted by attorneys to assess the sincerity of the service member's asserted religious beliefs, as well as immunization counseling by a medical officer. *Id.* Art. 12(a), (d), (h).  In deciding whether to grant or deny a religious accommodation request, the adjudication authority was required to consult with their servicing legal office.  *Id.* Art. 12(e).  Service members could appeal adverse decisions up through their respective chain of command.  *Id.* Art. 12(j).  This process typically took upwards of six months and, in the case of one Coast Guardsman, lasted nearly a year.

While there is no exact data regarding the final numbers of religious accommodations granted in the record presented, a DOD Office of Inspector General Report reported the following data as of January 2023[8]:

---

[5] *See* https://perma.cc/BFT3-WFVK (last visited Jan. 21, 2025).

[6] *See* https://perma.cc/T3XD-CPWZ (last visited Jan. 19, 2025).

[7] Commandant Instruction 1000.15 (Military Religious Accommodations), *available at* https://perma.cc/EUJ5-JCAQ (last visited Jan. 21, 2025).

[8] *See* U.S. Department of Defense Inspector General Report, *Audit of Military Services' Processing of Coronavirus Disease–2019 Vaccination Exemptions and Discharges for Active Duty Service Members*, at 23 (Mar. 12, 2024), *available at* https://perma.cc/QN77-LR63 (last visited Jan. 21, 2025).

| Military Service | Approved | Denied | Pending | Total |
|---|---|---|---|---|
| Air Force/Space Force | 169 (3.5%) | 4,626 (96%) | 17 (0.5%) | 4,812 |
| Army | 97 (2%) | 1,819 (41%) | 2,512 (57%) | 4,428 |
| Marine Corps | 23 (0.6%) | 3,686 (99.4%) | 0 | 3,709 |
| Navy | 50 (1.5%) | 3,256 (97.6%) | 30 (0.9%) | 3,336 |
| | | | | |
| **Total** | **339 (2.1%)** | **13,387 (82.2%)** | **2,559 (15.7%)** | **16,285** |

By contrast, the Coast Guard granted exactly zero of the 1,304 religious exemption requests filed as of January 2022. AR 133.[9] During oral argument, the government represented that the total number of religious accommodation requests granted by the Coast Guard remained zero through the recission of the vaccine mandate in January 2023.

In addition to religious accommodations, a number of service members across the military branches requested—and were granted in certain instances—medical and administrative exemptions and temporary waivers. *See, e.g.*, *Doster v. Kendall*, 54 F.4th 398, 435 (6th Cir. 2022) ("[The Air Force] has granted well over 4,000 medical and administrative exemptions."), *pet'n for cert. granted, vacated and remanded as moot*, __ U.S. __, 144 S. Ct. 481 (2023); *Schelske v. Austin*, 649 F. Supp. 3d 254, 283–84 (N.D. Tex. 2022) ("The Army has granted thousands of exemptions on secular (i.e., medical or administrative) grounds . . . ."). The limited Coast Guard data in the record reveals that six of twelve permanent medical exemptions were granted, four were denied, and two remained pending as of January 2022. AR 133. No data was reported with respect to the Coast Guard's assessment of temporary medical waivers or administrative exemptions. *See id.* It is estimated that some 8,400 service members were discharged or administratively separated from the Armed Forces as a whole due to their failure (or refusal) to be administered the COVID vaccine.[10]

## II.  MILITARY SERVICE

### A.  Mark A. Byrd

Petty Officer (PO) Byrd enlisted in the Coast Guard on October 17, 2006. Notwithstanding the events culminating in this action, he has rejoined the Coast Guard and currently serves on active duty as a Marine Science Technician,

---

[9]  "AR __" is a citation to the administrative record. The Court assumes a scrivener's error in the Coast Guard data labeled "Current as of 21 January 2021." AR 133. The COVID-19 vaccine mandate was not implemented until August 2021.

[10]  *See* https://www.politico.com/news/2023/01/13/pentagon-back-pay-troops-covid-vaccine-mandate-00077902 (last visited Jan. 20, 2025). Nealy half served in the Marine Corps. *See* https://www.marines .mil/Portals/1/Docs/COVID-19/Monthly%20COVID%20Update%201Dec% 202022.pdf (last visited Jan. 20, 2025).

First Class (PO1/E-6 or MST1).[11]  In response to the service-wide COVID-19 vaccine mandate, while stationed in North Carolina, MST1 Byrd filed a religious accommodation request on September 23, 2021.  The Adjudication Authority denied the request on February 11, 2022.  MST1 Byrd's March 10, 2022 appeal was denied by the Appellate Authority on May 12, 2022.  Six days later, MST1 Byrd was ordered to get vaccinated by June 1, 2022.  MST1 Byrd's reported efforts to confirm the availability of FDA-authorized Comirnaty® at two nearby military bases and private pharmacies in the area proved unsuccessful.  Only the EUA vaccine was offered.

On June 2, 2022, MST1 Byrd received a negative Coast Guard Form 3307 (CG-3307) (Administrative Remarks) (a/k/a "negative Page 7") for not meeting the June 1, 2022 vaccination deadline.  The CG-3307 noted that the Coast Guardsman's actions violated Article 90 (Willfully Disobeying a Superior Commissioned Officer) and Article 92(2) (Failure to Obey other Lawful Order) of the UCMJ, subjecting him to administrative and punitive consequences to include prosecution and separation from military service.  Thereafter, on August 17, 2022, MST1 Byrd's command initiated involuntary discharge proceedings, recommending that the Coast Guardsman be separated for the convenience of the government due to his non-availability for worldwide assignment (i.e., immunization status).  Notwithstanding his continued objection, MST1 Byrd was discharged for the convenience of the government effective October 28, 2022.  His character of service was honorable, and his reenlistment code (RE-3) rendered him ineligible for enlistment without a waiver.  At the time of separation, MST1 Byrd had earned over sixteen years of creditable service.

Six months after MST1 Byrd's discharge, the Coast Guard employed him as a civilian contractor performing essentially the same role.  The Return2Service Team immediately recruited MST1 Byrd to reenlist.[12]  He returned to active service effective June 15, 2023, with a four-year reenlistment contract.[13]  Accounting for the disruption to his otherwise continuous military service, MST1 Byrd's retirement date is now pushed to June 2027.

---

[11] For clarity, the Court refers to plaintiff Byrd as "MST1 Byrd" to reflect his designated rank and current active-duty service.

[12] The Return to Service initiative was launched "to help Coast Guard members who separated due to the Coast Guard's former COVID-19 vaccination mandate." *See* https://perma.cc/RB7H-QBGK (last visited Jan. 23, 2024).  Targeting former Coast Guardsmen like MST1 Byrd:

> Eligible members are those who were involuntarily separated solely due to noncompliance with the COVID-19 vaccine mandate and received a reenlistment code of RE-3, or who voluntarily separated between Aug. 26, 2021, and Jan. 11, 2023, in lieu of complying with the vaccine mandate and received a reenlistment code of RE-1 or RE-3. In addition, a member must be within two years of their separation date.

*Id.*

[13] The timing of Mr. Byrd's interrupted military service coincided with the May 2023 Coast Guard Servicewide Examinations (SWE), required for promotion to Chief Petty Officer (E-7).

B.  Aaron Gutierrez

Mr. Gutierrez enlisted in the Coast Guard on June 26, 2006, eventually rising to the rank of Electronics Technician, First Class (PO1/E-6 or ET1). In response to the service-wide COVID-19 vaccine mandate, while stationed in Virginia, Mr. Gutierrez filed a religious accommodation request on October 27, 2021. Mr. Gutierrez's subsequent refusal to undergo weekly COVID-19 testing prior to his base reassignment resulted in a series of reprimands in December 2021.[14] The Adjudication Authority denied his religious accommodation request on February 14, 2022. Mr. Gutierrez's March 3, 2022 appeal was denied by the Appellate Authority on May 13, 2022. On June 21, 2022, Mr. Gutierrez was ordered to get vaccinated within forty-eight hours. Citing his sincerely held religious beliefs, Mr. Gutierrez refused.

On June 23, 2022, Mr. Gutierrez received a negative CG-3307 for not meeting the vaccination deadline. The CG-3307 noted that the Coast Guardsman's actions violated Article 90 (Willfully Disobeying a Superior Commissioned Officer) and Article 92(2) (Failure to Obey other Lawful Order) of the UCMJ, subjecting him to administrative and punitive consequences to include prosecution and separation from military service. Four days later, Mr. Gutierrez's command notified him of their intent to initiate involuntary discharge proceedings, recommending that the Coast Guardsman be separated for the convenience of the government due to his non-availability for worldwide assignment (i.e., immunization status). Mr. Gutierrez immediately executed an acknowledgement form stating: "I do not object to being discharged." AR 669. Further acknowledging the possible implications of the as-yet determined character of his service, Mr. Gutierrez submitted a detailed letter in defense of an honorable discharge. He was honorably discharged effective July 29, 2022, with an E-3 reenlistment code. At the time of separation, Mr. Gutierrez had earned over sixteen years of creditable service.[15]

C.  Christopher D. Harkins

Mr. Harkins enlisted in the Coast Guard on December 2, 2003, eventually rising to the rank of Operations Specialist, First Class (PO1/E-6 or OS1). In response to the service-wide COVID-19 vaccine mandate, while stationed in Alaska, Mr. Harkins filed a religious accommodation request on October 20, 2021. The Adjudication Authority denied the request on February 1, 2022. Mr. Harkins' appeal was denied by the Appellate Authority on August 17, 2022. Five days later, he was

---

[14] Seeking redress, Mr. Gutierrez unsuccessfully filed a complaint with the Coast Guard's Equal Opportunity Office.

[15] Following his discharge, Mr. Gutierrez applied for and received disability benefits from the U.S. Department of Veterans Affairs (VA benefits) with a disability rating of 80%. He was reportedly contacted by the Return2Service Team on June 29, 2023, but declined the offer of reenlistment.

ordered to get vaccinated by September 5, 2022. Mr. Harkins' purported efforts to confirm the availability of FDA-authorized Comirnaty® proved unsuccessful. Only the EUA vaccine was offered.

On September 6 and 15, 2022, respectively, Mr. Harkins received verbal and then written notice of a negative CG-3307 for not meeting the September 5, 2022 vaccination deadline. The CG-3307 noted that the Coast Guardsman's actions violated Article 90 (Willfully Disobeying a Superior Commissioned Officer) and Article 92(2) (Failure to Obey other Lawful Order) of the UCMJ, subjecting him to administrative and punitive consequences to include prosecution and separation from military service. Mr. Harkins' command then restricted his access to secure areas and files and initiated involuntary discharge proceedings, recommending that the Coast Guardsman be separated for the convenience of the government due to his non-availability for worldwide assignment (i.e., immunization status). Notwithstanding his continued objections—and an approved twenty-year retirement date of January 1, 2024—Mr. Harkins was discharged for the convenience of the government effective December 1, 2022. His character of service was honorable, with a reenlistment code of RE-3. At the time of separation, Mr. Harkins had earned exactly nineteen years of creditable service.[16]

D. Christopher S. Musgrave

Mr. Musgrave enlisted in the Coast Guard in July 2007, eventually rising to the rank of Boatswain's Mate, Second Class (PO2/E-5 or BM2). In response to the service-wide COVID-19 vaccine mandate, while stationed in Texas, Mr. Musgrave filed a religious accommodation request on October 6, 2021. The Adjudication Authority denied his religious accommodation request on February 2, 2022. Mr. Musgrave's February 16, 2022 appeal was denied by the Appellate Authority on May 27, 2022. On June 6, 2022, Mr. Musgrave was ordered to get vaccinated immediately. Although he reported to the base medical clinic, Mr. Musgrave refused the EUA vaccine offered.

On June 15, 2022, Mr. Musgrave received a negative CG-3307 for not meeting the vaccination deadline. The CG-3307 noted that the Coast Guardsman's actions violated Article 90 (Willfully Disobeying a Superior Commissioned Officer) and Article 92(2) (Failure to Obey other Lawful Order) of the UCMJ, subjecting him to administrative and punitive consequences to include prosecution and separation from military service. Six days later, Mr. Musgrave's command notified him of their intent to initiate involuntary discharge proceedings, recommending that the Coast Guardsman be separated for the convenience of the government due to his non-availability for worldwide assignment (i.e., immunization status). Mr. Musgrave

---

[16] Following his discharge, the Return2Service Team reportedly advised Mr. Harkins that he would have to complete a three-year contract to secure his twenty-year retirement. He declined reenlistment.

immediately executed an acknowledgement form stating: "I do not object to being discharged." AR 689. In an attached letter, Mr. Musgrave confirmed his "request and intent for separation," asking that his "paperwork be expedited" to accommodate his onboarding for "a new job." AR 693. He was honorably discharged effective September 19, 2022, with an E-3 reenlistment code.[17] At the time of separation, Mr. Musgrave had earned over ten years and seven months of creditable service.[18]

E. Shane R. Nolan

Chief Petty Officer (CPO) Nolan enlisted in the Coast Guard on December 5, 2005. Notwithstanding the events culminating in this action, he currently serves on active duty as an Operations Specialist (CPO/E-7 or OS).[19] In response to the service-wide COVID-19 vaccine mandate, while stationed in Alaska, OS Nolan filed a religious accommodation request on October 13, 2021. The Adjudication Authority denied the request on February 10, 2022. OS Nolan's February 25, 2022 appeal was denied by the Appellate Authority on May 6, 2022. Eleven days later, on May 17, 2022, OS Nolan was ordered to get vaccinated within forty-eight hours. Although he reported to the base medical clinic, OS Nolan refused the vaccine citing his sincerely held religious beliefs.

On June 6, 2022, OS Nolan received a negative CG-3307 for not meeting the May 19, 2022 vaccination deadline.[20] The CG-3307 noted that the Coast Guardsman's actions violated Article 90 (Willfully Disobeying a Superior Commissioned Officer) and Article 92(2) (Failure to Obey other Lawful Order) of the UCMJ, subjecting him to administrative and punitive consequences to include prosecution and separation from military service. Thereafter, on August 5, 2022, OS Nolan's command initiated involuntary discharge proceedings, recommending that the Coast Guardsman be separated for the convenience of the government due to his non-availability for worldwide assignment (i.e., immunization status). Notwithstanding his continued objection and a renewed request for religious accommodation, OS Nolan was discharged for the convenience of the government effective November 14, 2022. His character of service was honorable, and an RE-3 reenlistment code. At the time of separation, OS Nolan had earned nearly seventeen years of creditable service.

---

[17] Mr. Musgrave claims he was required to repay his nearly $10,000 reenlistment bonus, plus administrative fees and interest.

[18] Between 2013 and 2017, Mr. Musgrave left the Coast Guard to pursue a college degree.

[19] As with MST1 Byrd, the Court refers to plaintiff Nolan as either "CPO Nolan" or "OS Nolan" to temporally reflect his designated rank and current active-duty service.

[20] OS Nolan's command digitally signed the CG-3307 on June 2, 2022. OS Nolan formally acknowledged receipt and issued a brief written response four days later.

As these events unfolded, in April 2022, OS Nolan ceremoniously advanced to the rank of Chief Petty Officer (E-7)—authorizing him to assume the title and wear the E-7 insignia on his uniform. His official advancement date, vesting all financial entitlements and protocols, was slated for June 1, 2022. OS Nolan's reported refusal to comply with the service-wide vaccine mandate prevented his formal advancement, resulting in the recission of his ceremonial advancement on June 15, 2022. Six months after his discharge, the Return2Service Team recruited OS Nolan to reenlist at the E-6 rank. He returned to active service on May 26, 2023, with a four-year reenlistment contract. He has since been promoted (again) to the rank of Chief Petty Officer (E-7), without a retroactive promotion date or back pay. Accounting for the disruption to his otherwise continuous military service, OS Nolan's retirement date is now pushed out to June 2027.

F.  Matthew W. Powers

Mr. Powers enlisted in the Coast Guard on January 24, 2011, eventually rising to the rank of Operations Specialist, First Class (PO1/E-6 or OS1). In response to the service-wide COVID-19 vaccine mandate, while stationed in Alaska, Mr. Powers filed a religious accommodation request on October 25, 2021. The Adjudication Authority denied the request on January 25, 2022. Mr. Powers' February 5, 2022 appeal was denied by the Appellate Authority on May 31, 2022. Three days later, he was ordered to get vaccinated by June 13, 2022. After reporting difficulties confirming the availability of FDA-authorized Comirnaty®, Mr. Powers was given a one-week extension and then notified that the FDA-approved vaccine was available at the designated military clinic. AR 716; ECF 8-6 at 2–3. Citing his sincerely held religious beliefs, Mr. Powers nevertheless refused the vaccine.

On June 21, 2022, Mr. Powers received a negative CG-3307 for not meeting the June 13, 2022 vaccination deadline. The CG-3307 noted that the Coast Guardsman's actions violated Article 90 (Willfully Disobeying a Superior Commissioned Officer) and Article 92(2) (Failure to Obey other Lawful Order) of the UCMJ, subjecting him to administrative and punitive consequences to include prosecution and separation from military service. Mr. Powers' command initiated involuntary discharge proceedings on August 3, 2022, recommending that he be separated for the convenience of the government due to his non-availability for worldwide assignment (i.e., immunization status). Notwithstanding his continued objections, Mr. Powers was discharged for the convenience of the government effective November 14, 2022. His character of service was honorable, with an RE-3 reenlistment code.[21] At the time of separation, Mr. Powers had earned twelve years of creditable service.[22]

---

[21] Like Mr. Musgrave, Mr. Powers maintains he was required to repay his reenlistment bonus in the amount of over $13,000, and that his request for a waiver was denied.

[22] Following his discharge, Mr. Powers applied for and received VA disability benefits, receiving a disability rating of 100%. He declined the Return2Service Team's recruiting efforts.

## DISCUSSION

Under Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces. In light of that bedrock constitutional principle, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988). As the [Supreme Court] has long emphasized, moreover, the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Therefore, it is "difficult to conceive of an area of governmental activity in which the courts have less competence." *Ibid.*

*Austin v. U.S. Navy Seals 1–26*, __ U.S. __, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring).  Nevertheless, where, as here, the Armed Forces fail to follow the rules of engagement duly passed by Congress, signed into law by the President, and then formally implemented in the form of regulations and instructions, the judiciary is called upon to serve as the backstop of enforcement.  The rule of law must equally protect the brave men and women who proudly don this Nation's military uniforms and swear an oath to support and defend the Constitution of the United States.

## I.    EMERGENCY USE PRODUCTS ACT

Federal law generally prohibits the introduction into interstate commerce any new drug or biologic without formal FDA approval that the product is safe and effective for the intended use.  *See Vanda Pharms., Inc. v. United States,* __ Fed. Cl. __, No. 23-629, 2025 WL 260709, at *2–3 (Jan. 22, 2025) (discussing FDA drug approval process).  In the wake of the September 11 attacks and the anonymous anthrax-laden mailings in the weeks that followed, the nation grew increasingly anxious about potential chemical, biological, radiological, and nuclear threats.  In response, the President proposed Project BioShield during his 2003 State of the Union Address.  "Among the principal components of the proposed Project BioShield legislation were provisions to enable [the] FDA to authorize medical products for use during emergencies even before they are proven to be safe and effective under ordinary FDA review."[23]  As part of the FY 2004 NDAA, Congress enacted two complementary pieces of legislation critical to evaluating this case: Authorization for Medical Products for Use in Emergencies, Pub. L. No. 108–136, § 1603(a), 117 Stat. 1392, 1684 (2003) (codified at 21 U.S.C. § 360bbb-3); and Emergency Use Products,

---

[23] *See Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*, 45 Op. O.L.C. __, slip op. at 2 (July 6, 2021), *available at* https://perma.cc/R8Q9-JP97 (citing H.R. 2122, 108th Cong. § 4 (2003)) (last visited Jan. 21, 2025).

Pub. L. No. 108–136, § 1603(b)(1), 117 Stat. 1392, 1684 (2003) (codified at 10 U.S.C. § 1107a).

In amending § 564 of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 360bbb *et seq*., Congress authorized the FDA to short-circuit the federal agency's standard health and safety review and approval processes for medical countermeasures, including vaccines, during duly designated emergency situations. The temporary bypass of formal regulatory review allows the FDA to quickly authorize unapproved medical products or unapproved uses of approved medical products to diagnose, treat, and prevent serious or life-threatening diseases. Among the public safeguards imposed by Congress is the requirement, to the extent practical, of informed consent. Specifically, § 564(e) specifies the information individuals being administered EUA products should receive, including:

> (I) that the Secretary [of Health and Human Services (HHS)] has authorized the emergency use of the product;
>
> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
>
> (III) *of the option to accept or refuse administration of the product*, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii) (emphasis added).[24]  Prior to COVID-19, the FDA issued approximately sixty-five EUAs. The federal agency's use of this statutory authority increased ten-fold during the first year of the pandemic, issuing EUAs for a host of vaccines, medicines, tests, personal protective equipment, and ventilators. *See* 45 Op. O.L.C. __, slip op. at 5–6 (citations omitted).

Effective March 27, 2020, the HHS Secretary issued a Notice of Emergency Use Authorization Declaration in response to the COVID-19 pandemic. 85 Fed. Reg. 18,250 (Apr. 1, 2020). Under this authority, beginning in December 2020, the FDA granted EUAs to: Pfizer, Inc. for the Pfizer-BioNTech COVID-19 Vaccine (Dec. 11, 2020); ModernaTX, Inc. for COVID-19 Vaccine (Dec. 18, 2020); Janssen Biotech, Inc. (of Johnson & Johnson) for the Janssen COVID-19 Vaccine (Feb. 27, 2021); and Novavax, Inc. for the Novavax COVID-19 Vaccine, Adjuvanted (July 13, 2022). *See* 86 Fed. Reg. 5,200-01 (Jan. 19, 2021); 86 Fed. Reg. 28,608-01 (May 27, 2021). On August 23, 2021, and January 31, 2022, respectively, FDA formally approved Pfizer's and Moderna's messenger RNA (mRNA) vaccines for certain age groups under the

---

[24] For clarity, provisions of the FDCA are generally referred to by their section number (here, § 564) rather than the official United States Code citation above.

brand names Comirnaty® and Spikevax®.[25]  Consistent with governing statute, the FDA conditioned each fast-track approval on providing potential recipients the option to accept or refuse the EUA vaccine required by § 564(e)(1)(A)(ii)(III).  *See* 45 Op. O.L.C. __, slip op. at 6 (citations omitted).

In turn, Congress enacted the Emergency Use Products Act, 10 U.S.C. § 1107a, to address the administration of EUA vaccines to military personnel, and the requirement of informed consent:

> In the case of the administration of a product authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) of such Act and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a(a)(1).  In the aftermath of the litigation linked to the Anthrax Vaccine Immunization Program, DOD formally adopted the following interpretation of § 1107a:

> In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients are provided an option to refuse administration of the product, the President may, pursuant to section 1107a of Reference (e), waive the option to refuse for administration of the medical product to members of the armed forces. Such a waiver is allowed if the President determines, in writing, that providing to members of the armed forces an option to refuse is not in the interests of national security. Only the Secretary of Defense may ask the President to grant a waiver of an option to refuse.

DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008).  As pointedly explained by the U.S. Department of Justice, Office of Legal Counsel:

---

[25] *See* https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#vaccines (last visited Jan. 9, 2025).  In the interim, other pharmaceutical companies developed COVID-19 vaccines and received EUA approval, including Eli Lilly & Co. for bamlanivimab and etesevimab (Feb. 9, 2021); GlaxoSmithKline LLC for sotrovimab (May 26, 2021); and Genentech, Inc. for ACTEMRA (tocilizumab) (June 24, 2021).  *See* 86 Fed. Reg. 28,608-01 (May 27, 2021); 86 Fed. Reg. 42,850 (Aug. 5, 2021).

> [W]e understand that DOD's position reflects the concern that service members, unlike civilian employees, could face serious criminal penalties if they refused a superior officer's order to take an EUA product. *See* 10 U.S.C. § 890; *see also United States v. Kisala*, 64 M.J. 50 (C.A.A.F. 2006) (upholding a soldier's punishment for refusing [anthrax] vaccine). In this way, service members do not have the same "option" to refuse to comply with a vaccination requirement as other members of the public.

*See* 45 Op. O.L.C. __, slip op. at 16.[26]  The same analysis clearly holds true for—and, thus, must extend to—Coast Guardsmen.  *See* COMDINST M623.4G ch. 8 Art. 8–3 (Nov. 7, 2013) ("The FDA may decide that potential recipients of a drug under an EUA should have the option to refuse it. The President may waive this option for military personnel.").  The President did not issue a § 1107a EUA informed consent waiver for the Armed Forces related to the COVID-19 vaccine.  *See Doe #1–#14 v. Austin*, 572 F. Supp. 3d 1224, 1232 (N.D. Fla. 2021) ("The DOD acknowledges that the President has not executed a wavier under [§ 1107a(a)(1)], . . . so as things now stand, the DOD cannot mandate vaccines that only have an EUA.").

Against this backdrop, the Court is called upon to decide whether the vaccination orders issued by plaintiffs' commanding officers in the summer of 2022 were lawful, meriting the threats—if not the initiations—of criminal prosecutions under the UCMJ and administrative involuntary separations from the Coast Guard for reported noncompliance.  As explained below, although vaccine orders appeared consistent with the governing law, serious questions remain concerning at least certain plaintiffs' ability to comply with the orders as drafted, as well as regarding the subsequent enforcement measures undertaken by the Coast Guard.  The apparent disconnects are highlighted in all but one of the follow-up negative CG-3307s plaintiffs received for reportedly not meeting the vaccination deadlines imposed.

In the summer of 2022, following the denials of their religious accommodation requests, and consistent with the vaccine mandate, each plaintiff received the substantively identical order from a duly authorized Coast Guard Officer in Charge:

---

[26] Further explaining the distinction between the Office of Legal Counsel's focus on the statutorily required information to be shared with the intended civilian vaccine recipient to solicit their consent and DOD's emphasis on a service member's required consent, the government cited the legislative history of § 1107a.  Specifically, the U.S. House of Representatives Conference Report addressing the FY 2004 NDAA noted:

> [Section 1107a] would authorize the President to waive the right of service members to refuse administration of a product if the President determines, in writing, that affording service members the right to refuse the product is not feasible, is contrary to the best interests of the members affected, or is not in the interests of national security.

H.R. Rep. No. 108–354, at 782 (2003), *quoted in* 45 Op. O.L.C. __, slip op. at 16.

> You are hereby ordered to report to [a specified military medical clinic or an approved vaccination location] by [specified date] and to receive the first dose of a *fully FDA-approved COVID-19 vaccine*. A violation of this order may subject you to administrative and disciplinary consequences and is punishable under the Uniform Code of Military Justice[, 10 U.S.C. §§ 801–946], including under Article 90 (willfully disobeying superior commissioned officer) and Article 92(2) (failure to obey a lawful order).

AR 671 (Gutierrez), 680 (Harkins), 692 (Musgrave), 704 (Byrd),[27] 715 (Powers), 729 (Nolan) (emphasis added). Of note, each vaccination order references the above-quoted "option to refuse" provision codified in COMDINST M623.4 and the potential for a presidential waiver. Again, the President did not issue a § 1107a EUA informed consent waiver for the Armed Forces related to the COVID-19 vaccine.

Plaintiffs maintain that no "fully FDA-approved COVID-19 vaccine" was offered at the designated vaccination sites or otherwise readily available in their respective regions. As such, they reportedly faced a binary choice: accept or refuse an EUA vaccine. Upon this premise, the Coast Guardsmen assert that adherence to the vaccination orders—as drafted and issued—was impossible. Nevertheless, despite their continued objections, each service member received a follow-up negative CG-3307 documenting their violations of Articles 90 and 92(2), UCMJ, immediately following the expiration of their vaccination deadline. AR 670 (Gutierrez), 681 (Harkins), 691 (Musgrave), 705 (Byrd), 716 (Powers), 730 (Nolan). With one notable exception, in contrast to the vaccination orders, the follow-up negative CG-3307s make no reference to "fully FDA-approved COVID-19 vaccines." Instead, they generically refer to the Coast Guardsman's directives "to receive the first dose of the COVID-19 vaccine," their acknowledgements of the same, and the service members' subsequent failures (or refusals) "to follow the order." AR 670 (Gutierrez), 681 (Harkins), 691 (Musgrave), 705 (Byrd), 730 (Nolan). In Mr. Powers' case, the follow-up negative CG-3307 states that the Coast Guardsman was afforded a one-week extension of the vaccination deadline to "await[] the availability of Comirnaty" and, despite being notified of the FDA-approved vaccine's availability at the designated military clinic, he failed (or refused) to take the vaccine. AR 716. Mr. Powers acknowledged these facts in a declaration filed in this case. *See* ECF 8-6 at 2–3.

In response, the government advances an interesting standing argument: plaintiffs' categorical unwillingness (or refusal) to be administered *any* COVID-19 vaccine renders the cited distinction between FDA-approved and EUA vaccines illusory.[28] Save for Mr. Powers, however, the standing argument falls short factually

---

[27] The May 18, 2022 vaccination order issued to MST1 Byrd only cites Article 92(2), UCMJ. However, as noted *infra*, his follow-up negative CG-3307 documents his violations of both Article 90 and 92(2).

[28] The government also challenges plaintiffs' reliance on the FY 2023 NDAA to invoke this Court's jurisdiction, explaining that the statute is not money-mandating. Although the relevant section of the

and legally.  In their requests for religious accommodations, for example, plaintiffs Harkins, Byrd, and Nolan expressed their willingness to consider alternative vaccines "deemed safe and effective" while reserving their concerns about the potential intrusions upon their sincerely held religious beliefs.[29]  AR 25 (Harkins); *accord* AR 173 (Byrd), 302 & 306 (Nolan).  Defendant's predictive proffer that all plaintiffs would have, like Mr. Powers, refused an FDA-approved vaccine improperly presumes the critical choice the Coast Guard ordered them to make but then failed to actually present.  As such, these Coast Guardsmen retained their rights to refuse the EUA vaccine and challenge the administration of the product in the absence of a presidential waiver under § 1107a and the implementing military regulations.  Each service member alleges they suffered an injury in fact (i.e., an encroachment upon their legally protected rights) directly attributed to the Coast Guard's vaccination orders and consequential adverse personnel actions that is redressable in this Court.  *See City of Fresno v. United States*, 124 F.4th 876, 895–96 (Fed. Cir. 2024) (constitutional standing elements) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *e.g.*, *Botello v. United States*, 173 Fed. Cl. 26, 41–42 (2024) (current and former members of Army National Guard and Air National Guard established standing to challenge DOD's vaccine mandate enforcement and resulting adverse personnel actions as violating § 1107a); *Bassen v. United States*, 171 Fed. Cl. 273, 284 (2024) (same for current and former active-duty service members and reservists in the Air Force, Army, and Marine Corps).

Defendant next asserts that the EUA vaccines offered to the Coast Guardsmen in the summer of 2022 were considered medically interchangeable with the then FDA-approved biosimilar vaccines, obviating any lingering health and safety concerns.[30]  Without support in the record, the government effectively proffers that the FDA retroactively granted full approval to vaccines developed and entered into the marketplace as EUA products, thereby circumventing § 1107a.  This argument fails to appreciate the import of the FDA's successive approval actions and the critical distinction between medical and legal interchangeability.  "FDA licensure does not retroactively apply to vials shipped before [Biologics License Application (BLA)] approval."  *Doe #1–#14*, 572 F. Supp. 3d at 1233 (citing 21 U.S.C. § 355(a) ("No person

---

FY 2023 NDAA does not give retroactive effect to the vaccine mandate recission or require reinstatement and back pay, plaintiffs' reliance upon the law is to demonstrate the legal infirmity of the Coast Guard's actions rather than their entitlement to money damages.  The Military Pay Statute, 37 U.S.C. § 204, vests this Court with jurisdiction over the claims raised.

[29] Plaintiffs Gutierrez and Musgrave requested general exemptions from the COVID-19 vaccine mandate.  AR 9 (Gutierrez), 97 (Musgrave).

[30] *See* Congressional Research Service, *FDA Approval of the Pfizer-BioNTech COVID-19 Vaccine: Frequently Asked Questions,* at 1 (Sept. 29, 2021) ("Comirnaty has the same ingredients and formulation as the Pfizer-BioNTech vaccine that is authorized under the EUA. The two products differ in branding and labeling but can be used interchangeably without any impact on safety or effectiveness."), *available at* https://crsreports.congress.gov/product/pdf/R/R46913#:~:text=The%20 two%20products%20differ%20in,-BioNTech%20COVID-19%20vaccine (last visited Jan. 17, 2025).

shall introduce . . . into interstate commerce any new drug, unless an approval of an application [for FDA licensure] *is effective* with respect to such drug." (emphasis added))). Indeed, formal FDA approval is contingent on more than the composition and use of the end product, let alone a retroactive and isolated assessment of biosimilarity and effectiveness.[31] It covers every stage of vaccine development from research and discovery, through proof of concept, testing, and manufacturing, and continues well beyond approval to monitor continued safety and effectiveness.[32] Nothing in the record presented establishes that the EUA vaccines offered to plaintiffs satisfied these exacting standards. That is the key to the truncated EUA process. For this reason, the FDA identifies the formally approved and EUA vaccines as "legally distinct."[33]

That legal distinction is on full display here. "Section 1107a's explicit cross-reference to the EUA provisions suggests a concern that drugs mandated for military personnel be actually BLA-approved, not merely chemically similar to a BLA-approved drug." *Doe #1–#14*, 572 F. Supp. 3d at 1233. The FDA's formal approvals of Comirnaty® and Spikevax® on August 23, 2021, and January 31, 2022, do not affect the legal status of the brand manufacturers EUA vaccines already in the marketplace for purposes of sidestepping the requirements of § 1107a; meaning, the Coast Guard had no authority to mandate them by fiat or by default. Distinguishable from the facial challenge brought against the DOD in *Doe #1–#14*, 572 F. Supp. 3d 1233, five of the six named plaintiffs in this case maintain—and the government has not successfully rebutted—that no "fully FDA-approved COVID-19 vaccine" was offered at the designated vaccination sites or otherwise readily available in their respective regions in time for the Coast Guardsmen to comply with the vaccine orders as drafted and issued. Once the issue was raised, § 1107a presented Coast Guard leadership with two viable options: recognize the service members' right to refuse administration of the EUA product offered or seek a presidential waiver of informed consent. For these reasons, the Court concludes—with the exception of Mr. Powers—that the Coast Guard's determinations the named plaintiffs violated Articles 90 and 92(2), UCMJ, are in error. At a minimum, the follow-up negative CG 3307s documenting these violations must be expunged from their miliary records.

The government's misguided effort to conflate the biosimilarity of the EUA and FDA-approved vaccines with the informed consent legal requirements of § 1107a merit a final note of historical reflection. Throughout the twentieth century, the federal government did not always adhere to the highest ethical standards and

---

[31] As noted in *Doe #1–#14*, there is some question as to whether Comirnaty® and Pfizer-BioNTech are in fact chemically identical given that the FDA-approved vaccine seemingly includes an excipient (i.e., inactive ingredient) not present in the EUA vaccine. *See* 572 F. Supp. 2d at 1230 n.5.

[32] *See* https://perma.cc/ER39-V4XA (last visited Jan. 17, 2025).

[33] *See* AR 157 n.1 (Fact Sheet: *FDA's Comirnaty Vaccine Information for Recipients and Caregivers* (Sept. 22, 2021)).

transparency in conducting medical studies. Most famous, of course, is the Tuskegee (Alabama) Syphilis Study, wherein the U.S. Public Health Service and the U.S. Centers for Disease Control and Prevention (CDC) conducted a forty-year study (1932 to 1972) of 600 Black men and the impact of untreated syphilis on their community without informed consent.[34]  Operation Whitecoat, in turn, was a twenty-year biodefense medical research project (1954 to 1973), wherein service members were infected with bacteria considered likely to be used in a biological attack in order to develop potential vaccines.  The Army reportedly targeted conscientious objectors—particularly, Seventh-day Adventists—to secure the roughly 2,300 "volunteers" in exchange for avoiding a combat deployment during Vietnam.[35]  The Army conducted a similar chemical warfare medical study between 1955 and 1975, known as the Edgewood/Aberdeen Experiments.  Over the course of this twenty-year study, nearly 7,000 service members were injected with over 250 chemicals in order to test protective clothing, evaluate the human body's response, and develop potential vaccines.  The nature and extent of the information disclosed by the government in securing the soldiers' participation in the study is unclear.[36]  It is against this backdrop of human experimentation—rather than the altruistic effort to prevent the spread of a global pandemic—that exacting laws of informed consent must be evaluated.[37]

Finally, the government argues that each Coast Guardsman's separation was ultimately based upon grounds other than their reported—and now expunged—violations of Articles 90 and 92(2), UCMJ: plaintiffs Gutierrez and Musgrave elected to voluntarily separate rather than face a disciplinary discharge or administrative separation, and plaintiffs Byrd, Harkins, Nolan, and even Powers were administratively discharged for the convenience of the government.  Notwithstanding the Court's lingering misgivings about the suspected fruit of the proverbial poisonous tree, the government is correct.  The Separation Authorization Form for each named plaintiff documents the specific basis for their separation as "Convenience of Government"; more specifically, their "Unavailability for World Wide [sic] Assignment," presumably due to their immunization status.  AR1 (Gutierrez), 17 (Harkins), 87 (Musgrave), 107 (Byrd), 219 (Powers), 266 (Nolan).  The stated basis falls with the general authority "otherwise provided by law" sanctioned in 10 U.S.C. § 1169(3).  *See Tippins v. United States*, 93 F.4th 1370, 1377–78 (Fed. Cir. 2024)

---

[34] *See* https://perma.cc/8YQL-HNEK (last visited Jan. 18, 2025).

[35] *See* https://www.pbs.org/wnet/religionandethics/2003/10/24/october-24-2003-operation-whitecoat/15055/ (last visited Jan. 18, 2025).

[36] *See* https://perma.cc/YPE5-UL2P (last visited Jan. 21, 2025).

[37] *See* GAO Report, Human Experimentation: An Overview on Cold War Era Programs (Sept 28, 1994), *available at* https://perma.cc/T4X5-L2PG (last visited Jan. 18, 2025); *Is Military Research Hazardous To Veterans' Health? Lessons Spanning Half A Century*, S. Comm. on Veterans' Affairs, S. Rpt. No. 103-97, 103d Cong., 2d Sess. (1994), *available at* https://perma.cc/5J53-64T7 (last visited Jan. 21, 2025).

("[E]very branch of the armed services has the statutory discretion to terminate a term of enlistment early and involuntarily if it is in the interest of the respective branch to do so and applicable procedures are followed."). Delegated to the Personnel Service Center (PSC) of the Coast Guard by operation of PSCINST 5402.1A, the authority to discharge Coast Guardsmen for convenience of government stems from COMDTINST M1000.4, which states:

> Commander (CG PSC) may authorize or direct enlisted members to separate for the convenience of the Government for any of these reasons. . . .
>
>         . . . .
>
> (7) A member's inability to perform prescribed duties, repeated absenteeism, or *non-availability for worldwide assignment.*

COMDTINST M1000.4 Art. 1.B.12.a(7) (AR 486) (emphasis added); *see* 14 U.S.C. § 505 (Functions and Powers Vested in the Commandant); *see also Anderson v. United States*, 111 Fed. Cl. 572, 585 (2013) (Navy did not violate § 1169 by delegating authority to separate members); *see generally* PSCINST 5402.1A (Coast Guard Delegation of Authority) (ECF 27 at 46–50).[38, 39] For these reasons, the Court concludes that the administrative separations in issue were ultimately prompted by the Coast Guardsmen's COVID-19 immunization status as opposed to their refusals to be administered an EUA vaccine or their reported violations of Articles 90 and 92(2), UCMJ, contrary to the protections afforded under 10 U.S.C. § 1107a.

## II.    RELIGIOUS FREEDOM RESTORATION ACT

RFRA generally proscribes placing substantial burdens on individual religious liberty, even through a rule of general applicability, unless the government satisfies the exacting strict scrutiny standard:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

---

[38] Plaintiffs' claims that § 505 is simply a "housekeeping" statute is misplaced given the broad authorities vested in the Commandant over military personnel "and issue rules, orders, and instructions, not inconsistent with law, relating to the organization, internal administration, and personnel of the Coast Guard." *See id.*

[39] Plaintiffs' contention that the Coast Guard's invocation of convenience of government as the basis for their separation is a post-hoc rationalization is belied by the consistent concern that service members remain worldwide deployable. *See, e.g.,* AR6, 20, 212, 216, 609, 620, 624, 631, 636, 641, 646. Moreover, as noted *supra*, determining military strength and the standards of deployability in the Coast Guard are precisely the kinds of nonjusticiable decisions this Court must refrain from adjudicating.

> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(a)–(b).  Subsection (c) expressly provides for judicial relief. *See id.* § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.").  "[D]esigned to provide very broad protection for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014), RFRA extends to the military.  *Cocker v. Austin*, 115 F.4th 660, 666 (5th Cir. 2024) ("Congress created in RFRA a cause of action for service members to vindicate their religious liberty rights.") (citing *U.S. Navy Seals 1–26 v. Biden*, 27 F.4th 336, 345–46 (5th Cir. 2022)); *see* 42 U.S.C. § 2000bb-2(1) ("the term 'government' [in RFRA] includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity").

The government does not challenge the named plaintiffs' assertions that compliance with the Coast Guard's vaccine mandate posed a substantial burden on their sincerely held religious beliefs.  In fact, during oral argument, the government represented that the Coast Guard accepted as true all faith-based representations included in the Coast Guardsmen's applications for religious accommodation.  The plaintiffs, in turn, acknowledge the Coast Guard's compelling interest in ensuring the health and safety and medical readiness of all service members.  Consequently, the Court's examination is limited to whether the Coast Guard employed the least restrictive means as applied "to the person" in furthering that compelling governmental interest consistent with the First Amendment and RFRA.  The short answer is no.

Critical to today's ruling is the clear disconnect between the Coast Guard policy addressing religious accommodation requests and the military branch's execution of that policy in connection with the COVID-19 vaccine mandate.  As outlined *supra*, the written policy provides Coast Guardsmen a procedural avenue to seek an exemption or temporary waiver based upon their sincerely held religious beliefs, including appeals of adverse determinations by their command.  While strikingly onerous—particularly the infusion of clergy, medical personnel, and attorneys in the vetting process—there is, *in theory*, a path for each service member to demonstrate the reasonableness of the specific religious accommodation requested.

In practice, no Coast Guardsman stood a chance.  During oral argument, when confronted with the stark data (i.e., 0 out of 1,304) and asked for an example of a conceivably successful religious accommodation request, the government demurred.

Defendant explained that the Coast Guard opted not to undertake the difficult task of adjudicating the sincerity of each service member's proffered religious beliefs and their faith-based objections to the COVID-19 vaccine. Instead, the Coast Guard simply credited the service members' representations and, nevertheless, denied all requests for religious accommodation. In doing so, the Coast Guard predetermined that the military's need for near-universal vaccination trumped the constitutional rights and religious liberties of individual Coast Guardsmen. The Court's findings in this regard are amply demonstrated by the Mad Libs® fill-in-the-blank approach to processing—and summarily denying—religious accommodation requests. *Compare* AR 607–11, 629–48 (Adjudication Authority denial templates), *and* AR 612–14 (Appellate Authority denial templates), *with* AR 2, 5–7 (Gutierrez), 18, 27–30, 70–73 (Harkins), 88, 92–94 (Musgrave), 108–09, 175–77, 186–88 (Byrd), 220, 240–42, 267–70 (Powers), 279, 295–98 (Nolan).[40]

The Coast Guard's decision to ostensibly credit the sincerity of each Coast Guardsman's proffered religious beliefs and their faith-based objections to the COVID-19 vaccine in universally denying all religious accommodation requests runs afoul of the letter and spirit of RFRA. The Act requires that these assessments be made on an individual level or, more precisely: "to the person." 42 U.S.C. § 2000bb-1(b); *see U.S. Navy Seals 1–26*, 27 F.4th 351 ("The question . . . is not whether [the Navy has] a compelling interest in enforcing its [vaccination] policies generally, but whether it has such an interest in denying an exception to [each plaintiff].") (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021)) (emphasis added). Here, the Coast Guard's preordained outcomes improperly assessed the burden to the group as a whole rather than any individual. In evaluating the practices of the military branches in this regard, other judges have characterized the adjudications of religious accommodation requests as "quite plausibl[y] . . . a ruse" and "just 'theater.'" *Navy Seal 1 v. Biden*, 574 F. Supp. 3d 1124, 1144 (M.D. Fla. 2021); *Air Force Officer v. Austin*, 588 F. Supp. 3d 1338, 1354 (M.D. Ga. 2022). This Court adds "cruel." Forcing Coast Guardsmen to endure the protracted petition and appeal process—pitting their faith against their military service when the adverse outcome was inevitable—was an exercise in futility. While it is possible that a proper evaluation of the named plaintiffs' requests for religious accommodation would have been denied, no support for that conclusion can be found in the record presented.

The Coast Guard's decision to deny every religious accommodation request is further undermined by the other military branches' grant of at least some faith-based

---

[40] Interestingly, the administrative record includes a template for the Commandant to *grant* an appeal of a religious accommodation denial. AR 615. But the approval memorandum does not credit the faith-based objection to the COVID-19 vaccine. Rather, the options for "temporary accommodat[ion]" approval include: "you [are starting terminal leave, medically non-deployable, facing court-martial, etc.]." *Id.* (brackets in original in latter quote). The template is clearly designed for a Coast Guardsman with an imminent separation date, effectively converting a religious accommodation request into a request for an administrative exemption.

exemptions and temporary waivers. As captured in the chart included in the Background Section of this opinion, *supra*, the Air Force/Space Force, Army, Marine Corps, and Navy collectively granted hundreds of religious accommodation requests during the pendency of the COVID-19 vaccine mandate. Although the successful petitions account for just over two percent of requests filed, they exhibit a modicum of appreciation that the Armed Force's goal of near-universal vaccination in the fight against COVID-19 can and must be properly weighed against the constitutional and statutory rights vested in each service member. The data exhibits a recognition that the applicable test is not what is in the best interest of the military or the most expedient method of keeping troops safe, healthy, and ready for worldwide deployment. Rather, as RFRA makes clear: the Coast Guard must demonstrate that the substantial burden placed on an individual service member's religious liberty is being carried out in the least restrictive means available. The fact that the other military branches implemented comparatively less restrictive means in burdening individual service member's religious freedoms underscores the Coast Guard's inadequate approach.

For these reasons, the Court holds that the Coast Guard failed to employ the least restrictive means in furthering a compelling government interest at the expense of the Coast Guardsmen's religious freedom. Further, unlike plaintiffs' EUA claims, their asserted violations of RFRA are more directly tied to their separations from the Coast Guard. Finding that the Coast Guard failed to properly evaluate religious accommodation requests, the Court is left to wonder: if the petitions were duly considered under applicable law, would any Coast Guardsmen have been granted an exemption or temporary waiver? And, if so, would the service member have been separated for the convenience of the government regardless or allowed to remain on active duty at least until the vaccine mandate was rescinded? On the record presented, these crucial questions lack answers that judges should not hazard to decide in the first instance. *See Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense.") (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)). "[J]udges are not given the task of running the Army." *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953), *quoted in Voge*, 844 F.2d at 779.

A remand is certainly in order to allow the Coast Guard to address these vexing questions as to the involuntarily separated Coast Guardsmen: plaintiffs Byrd, Harkins, Nolan, and Powers. Having honorably served for nineteen years at the time of his involuntary separation, and with a pre-approved retirement date on the books, Mr. Harkins' case exemplifies the perils of the one-size-fits-all approach adopted by the Coast Guard. Unfortunately, as asserted by the government, in electing to voluntarily separate from the military rather than face a disciplinary discharge or administrative separation, plaintiffs Gutierrez and Musgrave forfeited their rights to seek legal redress in this Court. *See Metz v. Unites States*, 466 F.3d 991, 999–1000 (Fed. Cir. 2006) ("[I]f a plaintiff cannot establish that he is currently on active duty,

he must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of § 204, or else his claim falls for failure to state a claim upon which relief can be granted."). As noted above, both Mr. Gutierrez and Mr. Musgrave circled the option "I do not object to being discharged" when presented with their formal Notice of Intent to Discharge.  AR 654 (Gutierrez), 689 (Musgrave).[41]  Mr. Musgrave then followed up with a message informing the Coast Guard of his "request and intent for separation," asking that his discharge "be expedited" to facilitate his transition to civilian life and his new career opportunity.  AR 693.

## III.    MISCELLANOUS PROCEDURAL PROTECTIONS

In addition to challenging the processes through which they were selected for discharge and ultimately administratively separated, the named plaintiffs assert they were denied a series of procedural protections and benefits.  Addressing these issues seriatim, the Court first divides the named plaintiffs into two groups: those involuntarily separated (i.e., plaintiffs Byrd, Harkins, Nolan, and Powers), and those who elected to voluntarily separate rather than face further disciplinary or administrative separation proceedings (i.e., plaintiffs Gutierrez and Musgrave).  As explained *supra*, the Court's conclusion that the Coast Guard failed to properly assess the requests for religious accommodation submitted by those involuntarily separated calls into serious question whether they were properly separated for the convenience of the government.  Until that critical question is resolved, certain collateral claims raised by these Coast Guardsmen are not ripe.  In turn, as noted above, by opting to separate from the Coast Guard, plaintiffs Gutierrez and Musgrave forfeited their ability to challenge the voluntariness of their elections.  The pronouncements below are to be considered by the Coast Guard as it works through the relief due—or to be conferred upon—the named plaintiffs as well as any similarly situated members of the putative class.

### A. Discharge Boards

As a general rule, discharges for the convenience of the government do not require discharge boards. COMDTINST M1000.4 Art. 1.B.12.a (AR 486) ("Except as otherwise indicated below, members separated for the convenience of the Government are not entitled to an administrative discharge board.").  Relevant here, however, there are exceptions for cases where commanding officers "contemplate" a less than honorable misconduct discharge or the Coast Guardsman facing a

---

[41] This Court rejects plaintiffs' argument that Mr. Gutierrez's and Mr. Musgrave's cooperation was a result of coercion. Coercion requires, *inter alia*, demonstrating that "circumstances permitted no other alternative."  *Carmichael v. United States*, 298 F.3d 1367, 1372 (Fed. Cir. 2002).  In this case, the fact that the other four named plaintiffs objected to their proposed discharges demonstrates that Messrs. Gutierrez and Musgrave had a viable alternative.

misconduct discharge has eight or more years of military service regardless of the contemplated character of service:

> Commanding officers shall process all cases in which they contemplate a discharge under other than honorable conditions for misconduct as Article 1.B.23 of this Manual [(Procedure for Discharge under Other than Honorable Conditions)] prescribes. In addition, they shall follow that Article's procedures if considering discharging any member with eight or more years of total active and inactive military service for misconduct, even if contemplating an honorable or general discharge.

COMDTINST M1000.4 Art. 1.B.17.d (AR 503). The convening of a discharge review board, in turn, entitles both the service member and the government the right to legal representation. *Id.* Art. 1B.23.a (AR 518).

Each named plaintiff had more than eight years of military service at the time of their administrative separation. They further received from their respective commands a "warning" CG-3307 stating: "Refusal to receive the vaccine . . . may result in both administrative and punitive consequences, to include punishment or prosecution under the Uniform Code of Military Justice." AR 679 (Harkins), 690 (Musgrave), 703 (Byrd), 714 (Powers), 725 (Nolan).[42] The service members were then directed to receive the vaccine by a date certain or be found in violation of Articles 90 and 92(2), UCMJ. AR 671 (Gutierrez), 680 (Harkins), 692 (Musgrave), 704 (Byrd), 715 (Powers), 727 (Nolan). After failing (or refusing) to meet the vaccination deadline, each Coast Guardsman received a CG-3307 finding they violated Articles 90 and 92(2), UCMJ. AR 705 (Byrd), 670 (Gutierrez), 681–82 (Harkins), 691 (Musgrave), 716 (Powers), 730 (Nolan). While the successive CG-3307s do not specifically reference the threat or initiation of a misconduct discharge, the escalating message is clear: their commands are taking the matter seriously and the service members face certain adverse consequences.

The Coast Guard seeks to disconnect the foregoing disciplinary proceedings from the basis formally documented in the administrative separations in issue: convenience of government. Most troubling, the government's position lacks any memoranda in the record documenting the rationale behind the abrupt service-wide pivot. This void leaves the Court to guess whether each plaintiff's commanding officer "contemplated" a misconduct discharge carrying a less than honorable character of service or "considered" a misconduct discharge regardless of the character of service. Mercifully, in light of today's rulings, the Court need not engage in such supposition.

---

[42] Although Mr. Gutierrez's warning CG-3307 is missing from the administrative record filed in this case, contemporaneous documents exhibit his identical treatment. *See, e.g.*, AR 7 ("If you do not begin the COVID-19 regimen or submit an appeal within 10 business days after receipt of this decision, you will be in violation of the lawful order . . . to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.").

Until the propriety of the involuntarily separated group of plaintiffs is conclusively established, this issue is not ripe. Conversely, the voluntarily separated group of plaintiffs forfeited their right to a discharge review board.

### B. Reenlistment Boards

Plaintiffs claim that they were wrongly denied reenlistment boards, as the COMDTINST M1000.4 states that "[m]embers who have eight or more years of total active duty and/or reserve military service that meet the reenlistment eligibility criteria in [COMDTINST M1000.2] but are not recommended for reenlistment by their commanding officer are entitled to a reenlistment board." COMDTINST M1000.4 Art. 1.B.5.c (AR 466). Conversely, the instruction provides:

> Members who have eight or more years of total active duty and/or reserve military service who do not meet the reenlistment eligibility criteria in . . . [COMDTINST M1000.2] are not entitled to a reenlistment board and must be processed for separation as directed by par. 1.E.4.b. of . . . [COMDTINST M1000.2] (series). However, these members must be afforded the opportunity to submit a written statement on their behalf for consideration by [a designated PSC] Commander . . . .

*Id.* (bold omitted). The Government argues that because plaintiffs failed to satisfy the requirements of the first condition, the latter provision applies by default.

Critical to resolving this issue is the reference to the service member's commanding officer and, more specifically, their position (or recommendation) on whether the Coast Guardsman should be eligible for reenlistment. Article 1.B.5.a of COMDTINST M1000.4 complementarily provides: "If at the time of the initial pre-discharge interview . . . or any time after a commanding officer determines an enlisted member is not eligible to reenlist the procedure found in par. 1.E.4. of . . . Enlistments, Evaluations, and Advancements, COMDTINST M1000.2 (series) shall apply." AR 465 (bold omitted). In this case, plaintiffs' commanding officers made no affirmative recommendations (positive or negative) regarding their eligibility for reenlistment. Instead, the Personnel Service Center issued, as a matter of course, the conditional reenlistment codes (RE-3) due to the Coast Guardsmen's inoculation status, rendering the plaintiffs ineligible for reenlistment without a waiver. Contrary to plaintiff's assertion, a commanding officer's failure to make an affirmative recommendation that a service member *be eligible* for reenlistment is not tantamount to a recommendation that the Coast Guardsman *not be eligible* for reenlistment. Rather, as the government more persuasively argues, these instructions—although not the model of clarity—strongly suggest that triggering an entitlement to a

reenlistment board requires an affirmative recommendation by a commanding officer that the Coast Guardsman not be eligible for reenlistment.[43]

Notwithstanding the foregoing, this issue remains in flux for the involuntarily separated group of plaintiffs (again, Byrd, Harkins, Nolan, and Powers). If a proper assessment of their religious accommodation requests results in granting retroactive exemptions or temporary waivers dating to the rescission of the COVID-19 vaccine mandate, their current reenlistment codes must be reevaluated to reflect their corrected military personnel records. Depending upon those outcomes, their claims for reenlistment boards may be moot or worth revisiting. Regarding plaintiffs Gutierrez and Musgrave, their elections to voluntarily separate preclude further review in this Court.

C. Separation Pay

Title 10, United States Code, Section 1174, titled "Separation Pay Upon Involuntary Discharge or Release from Active Duty," provides in part:

> A regular enlisted member of an armed force who is discharged involuntarily . . . and who has completed six or more, but less than 20, years of active service immediately before that discharge is entitled to separation pay computed under subsection (d) unless the Secretary concerned determines that the conditions under which the member is discharged do not warrant payment of such pay.

10 U.S.C. § 1174(b)(1). As enlisted members of the Coast Guard with between ten and nineteen years of creditable military service at the time of their administrative—and, reportedly involuntary—separations, plaintiffs claim they are statutorily entitled to separation pay.

In *Collins v. United States*, 101 Fed. Cl. 435 (2011), this Court highlighted three statutory entitlement factors relevant here. First, consistent with plaintiffs' interpretation, "[r]ather than give the [Service] Secretary . . . discretion to award pay, § 1174(b) creates a default rule of payment." 101 Fed. Cl. at 443. Stated differently: "This statutory provision establishes a default that, unless the Secretary [concerned] says otherwise, a servicemember who has served at least six years, but less than twenty years, is entitled to separation pay under a statutory formula." *Id.* Second, § 1174(e) includes the following obligation:

---

[43] This finding is dependent on the facts and circumstances particular to this case. This Court issues no opinion on whether a service member is entitled to a reenlistment board in the absence of a commanding officer's recommendation (as opposed to a negative recommendation) if the service member is otherwise eligible for reenlistment, as demonstrated by receiving an RE-1 reenlistment code.

> As a condition of receiving separation pay under this section, a person otherwise eligible for that pay shall be required to enter into a written agreement with the Secretary concerned to serve in the Ready Reserve of a reserve component for a period of not less than three years following the person's discharge or release from active duty.

10 U.S.C. § 1174(e)(1)(A), *quoted in part in Collins*, 101 Fed. Cl. at 444. Third, that the service member is not otherwise ineligible to receive separation pay under § 1174(e)(2), which includes voluntary separation. *See* 10 U.S.C. § 1174(e)(2)(A), *cited in Collins*, 101 Fed. Cl. at 444.

In the Coast Guard, the duly authorized representative of the Secretary to decide when separation pay is not warranted is the Commander, Personnel Service Center. COMDTINST M7220.29D, ch. 10-1, Art. H.2.(f) (Nov. 2019). Rather than cite the affirmative decision of the PSC Commander to disallow separation pay as required under *Collins*, the government relies upon the absence of an affirmative award of separation pay memorialized in the Coast Guardsmen's Separation Authorizations and the lack of an executed Ready Reserve agreement. *See* AR 1 (Gutierrez), 17 (Harkins), 87 (Musgrave), 107 (Byrd), 219 (Powers), 266 (Nolan).

Following the persuasive teachings of *Collins*, the Court finds that the Coast Guard abdicated its duty with respect to the group of involuntarily separated plaintiffs to either award separation pay and require a commitment of continued service in the Ready Reserves or make (and document) the affirmative decision "that the conditions under which the member is discharged do not warrant payment of such pay" as required under 10 U.S.C. § 1174(b)(1). As with the other collateral benefits discussed herein, the award of separation pay to plaintiffs Byrd, Harkins, Nolan, and Powers must await the results of the reassessments of their religious accommodation requests to conclusively determine whether they were properly involuntarily discharged. In contrast, Messrs. Gutierrez's and Musgrave's voluntary separations render them ineligible to receive separation pay by operation of § 1174(e)(2)(A).

D. Right to Counsel

Plaintiffs generally claim they were denied their right to counsel at various checkpoints in the course of their military separations. Although facially appealing, especially as the reported facts of this case do not represent the government's finest hour, plaintiffs' argument conflates the obligatory notice of their right to consult with an attorney and the entitlement to a meaningful consultation or legal representation. For example, Art. 1.B.5.a. of COMDTINST M1000.4 states:

> Right to Counsel. Commanding officers shall give any individual who is notified that they are not eligible to reenlist under this Article whose performance evaluations indicate the possibility of receiving a general

(under honorable conditions) discharge the *opportunity to consult* with a military lawyer for an explanation of rights before sending the required documentation to Commander (CG PSC-EPM-1). The member *may also consult* a civilian counsel of choice at his or her own expense.

AR 465 (italics added; bold omitted); *accord* COMDTINST M1000.4, Art. 1.B.12.d (AR 488) ("Member's Right to Attorney. Commanding officers recommending involuntary separation under this Article for a member whose [personal data record (PDR)] indicates issuance of a general discharge must give the member the *opportunity to consult* with a lawyer counsel [sic] before initiating such action.") (italics added; bold omitted).  These instructions clearly differ from service members' "entitlements" to "legal representation" and "the appointment of military counsel qualified under Article 27(b), UCMJ," when facing an administrative discharge board codified in COMDTINST M1000.4, Art. 1.B.23.a (AR 518).

The formal Notification of Intent to Discharge signed by each named plaintiff documents that the Coast Guardsmen were "provided the *opportunity to consult* with a military lawyer."  AR 654 (Gutierrez), 678 (Harkins), 689 (Musgrave), 702 (Byrd), 713 (Powers), 724 (Nolan).  The Coast Guardsmen represent that their efforts to engage military counsel were met with terse responses to the effect of the Office of the Judge Advocate General would neither assign counsel or represent service members "facing discipline or discharge for being unvaccinated," and military counsel otherwise failed to provide meaningful legal advice or assistance.  *See* ECF 18-5 ¶¶ 27–29 (Harkins declaration); *accord* ECF 18-7 ¶ 22 (Nolan declaration); ECF 18-8 ¶ 18 (Powers declaration).[44]  Although the service members clearly deserved better, they were not legally entitled to more than the Coast Guard's literal compliance with the governing instruction to afford them "the *opportunity* to consult with a military lawyer."  With the proverbial bar set so low, the Court has no choice but to conclude that the government cleared it.

E.    Pre-Separation Medical Treatment

Five of the six named plaintiffs (save Mr. Powers) generally charge they did not undergo a pre-separation medical examination, and Mr. Harkins further complains he did not receive adequate dental treatment prior to his separation. Speaking to these issues, COMDTINST M1000.4 provides that "every enlisted member, except those discharged or retired for physical or mental disability, *shall* be given a complete physical examination . . . [b]efore retirement, involuntary separation, or release from active duty . . . into the Ready Reserves."  *Id.* Art. 1.B.6.a (emphasis added) (AR 469).  The instruction further states: "the physical examination shall be given at least six months before separation from active duty."  *Id.*

---

[44] Plaintiffs Byrd, Gutierrez, and Musgrave simply represent that they were not "provided" or "offered" military counsel.  *See* ECF 18-3 ¶ 20 (Byrd declaration); ECF 18-4 ¶ 17 (Gutierrez declaration); ECF 18-6 ¶ 24 (Musgrave declaration).

Notwithstanding the mandatory language employed (i.e., "shall"), the regulatory scheme does not generally condition a service member's separation—voluntary or involuntary—on their undergoing a physical examination or receiving a specific level of medical treatment or care.[45]  When pressed on the latter point during oral argument, plaintiffs could not articulate an applicable objective measure of inadequate medical treatment that would void a military separation or otherwise avoid the application of a harmless error analysis.  In contrast, the government credibly asserted that the more logical resolution of this issue lies in the former service member seeking reimbursement from the Coast Guard for out-of-pocket medical expenses incurred that should have been discovered and/or treated prior to their separation.  Alternatively, service members may be returned to active duty for the sole purpose of receiving medical treatment.  Again, the Court need not resolve this issue today as it is not yet ripe for the involuntarily separated group of plaintiffs, including Mr. Harkins, and has been waived by those that voluntarily separated.

F.  Reenlistment Bonuses

Plaintiffs Musgrave and Powers contend their reenlistment bonuses were illegally recouped by the government.[46]  Title 37, United States Code, Section 373 provides in part:

> Except as provided in subsection (b), a member of the uniformed services who is paid a bonus, incentive pay, or similar benefit, the receipt of which is contingent upon the member's satisfaction of certain service or eligibility requirements, *shall repay to the United States* any unearned portion of the bonus, incentive pay, or similar benefit if the member fails to satisfy any such service or eligibility requirement, and the member may not receive any unpaid amounts of the bonus, incentive pay, or similar benefit after the member fails to satisfy such service or eligibility requirement.

---

[45] The exception to this general rule is if the medical examination results in a finding that the service member to be discharged has "disqualifying physical or mental impairments," in which case, "[i]f the member . . . is being discharged for reasons other than enlistment expiration and the physical or mental impairment is permanent, a medical board is convened . . . and the member remains in service under Article 1.B.11.i. [of COMDTINST M1000.4]." AR 470.  Article 1.B.11.i., in turn, allows commanding officers to "detain a member in service beyond the enlistment term for up to 30 days" if, among other circumstances, the medical exam finds a disqualifying physical or mental defect. AR 484. In this case, only Mr. Harkins laid claim to a disqualifying condition (i.e., a broken tooth).  Review of the Coast Guard Medical Manual, COMDINST M6000.1F (June 2018), suggests that his condition temporarily prevented him from worldwide deployable (pending repair), but did not constitute a disqualifying physical impairment.

[46] As noted *supra*, the Court rejects the argument that the recoupment of a reenlistment bonus in a military back pay case can serve an independent illegal exaction claim.

37 U.S.C. § 373(a) (emphasis added). Subsection (b) includes a list of exceptions, including the discretionary authority to waive recoupment "if the Secretary determines that the imposition of the repayment . . . with regard to a member of the uniformed services would be contrary to a personnel policy or management objective, would be against equity and good conscience, or would be contrary to the best interests of the United States." *Id.* § 373(b)(1). Unlike separation pay, addressed *supra*, the default application of this statute requires repayment rather than forgiveness.

For Mr. Powers, this issue is not ripe as his involuntary separation remains an open question pending the reassessment of his religious accommodation request. Unfortunately for Mr. Musgrave, the Secretary of the Coast Guard or their duly authorized delegate did not make the affirmative election to extend him this statutory grace. This Court cannot overturn that discretionary decision. *Murphy v. United States*, 993 F.3d 871, 873 (Fed. Cir. 1993) ("[T]here are 'thousands of [ ] routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with.'") (quoting *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988)) (alteration in original).[47]

## CONCLUSION

For the foregoing reasons, the named plaintiffs' motion for judgment on the administrative record (ECF 26) is **GRANTED-IN-PART** and **DENIED-IN-PART** and, conversely, defendant's cross-motion to dismiss and for judgment on the administrative record (ECF 27) is **DENIED-IN-PART** and **GRANTED-IN-PART**. The parties shall **FILE** a joint status report on or before **February 13, 2025**, proposing a schedule of continued proceedings in this case, including addressing the issue of class certification and any proposed remand proceedings.

It is so **ORDERED**.

Armando O. Bonilla
Judge

---

[47] Plaintiffs also raise a host of other collateral claims relating to their failure to receive pre-discharge benefits and services to which they were allegedly entitled under 10 U.S.C. §§ 1141–55 including: pre-separation counseling, employment assistance, job training assistance, health benefits, use of military family housing, and relocation assistance. As with the issues addressed in this section, these claims are similarly not ripe for the involuntarily separated group of plaintiffs and waived by the voluntarily separated plaintiffs.