# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 23-1238C
(Filed: October 14, 2025)

|  |  |
|---|---|
| **CHRISTOPHER D. HARKINS, *et al.,*** | ) |
|  | ) |
| *Plaintiffs,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| **UNITED STATES**, | ) |
|  | ) |
| *Defendant.* | ) |
|  | ) |

*Dale F. Saran*, Dale F. Saran, LLC, Olathe, Kansas, for plaintiffs. With him on the briefs were *Barry P. Steinberg*, Kutak Rock LLP, Washington, DC; and *J. Andrew Meyer* and *Brandon Johnson*, St. Petersburg, FL.

*Kyle S. Beckrich*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, and *Patricia M. McCarthy*, Director, and *William J. Grimaldi*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Brian Judge*, Chief, Office of Claims and Litigation, U.S. Coast Guard, Washington, DC, Of Counsel.

## OPINION AND ORDER

**BONILLA, *Judge*.**

Through this action, six current and former United States Coast Guardsmen challenge their separations and their denials of service-related protections and benefits for reportedly failing or refusing to comply with the military's now-rescinded COVID-19 vaccine mandate. Plaintiffs are among the 1,351 Coast Guardsmen whose religious accommodation requests were denied by the service. On January 23, 2025, this Court resolved several critical issues in this case, including: the import of the Emergency Use Product Act, 10 U.S.C. § 1107a; the implications of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1; the effect of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 525, 136 Stat. 2395, 2571–72 (2022); the conversions of noticed disciplinary discharges for alleged violations of the Uniform Code of Military Justice (UCMJ) to administrative separations for the convenience of the government under

10 U.S.C. § 1169(3); the consequences of voluntary separation in lieu of disciplinary or administrative separation; and the denials of specified procedural rights and benefits associated with their separations (e.g., administrative discharge boards, reenlistment boards, counsel, pre-separation medical treatment, and separation pay). *Harkins v. United States*, 174 Fed. Cl. 592 (2025).

Four days after the Court addressed these issues, the President issued Executive Order No. 14184, titled *Reinstating Service Members Discharged Under the Military's COVID-19 Vaccination Mandate.*  Under Section 2, the President directed the United States Secretaries of Defense and Homeland Security to:

(a) make reinstatement available to all members of the military (active and reserve) who were discharged solely for refusal to receive the COVID-19 vaccine and who request to be reinstated;

(b) enable those service members reinstated under this section to revert to their former rank and receive full back pay, benefits, bonus payments, or compensation; and

(c) allow any service members who provide a written and sworn attestation that they voluntarily left the service or allowed their service to lapse according to appropriate procedures, rather than be vaccinated under the vaccine mandate, to return to service with no impact on their service status, rank, or pay.

90 Fed. Reg. 8761 (Jan. 27, 2025).  The government moved to stay implementation of the Court's January 23, 2025 decision pending the military's execution of the President's directive.  Although the Executive Order and the Court's decision overlap in certain respects, the Venn diagram is not depicted by concentric circles.  Critical distinctions include the Executive Order's broad application to Coast Guardsmen who *voluntarily* separated from military service as well as reservists, and the requirement that affected service members reenlist and return to active duty to be entitled to relief.[1]  The Court accordingly denied the government's motion.

Instead, the Court remanded this matter to the Coast Guard for further proceedings consistent with the Court's January 23, 2025 decision pursuant to Rule 52.2(a) of the Rules of the United States Court of Federal Claims (RCFC).  By agreement, the Coast Guard sent tailored notices to all 1,351 current and former Coast Guardsmen potentially impacted by the Court's decision, consisting of: 274 Coast Guardsmen who voluntarily or involuntarily separated from the service

---

[1] As noted in this Court's January 23, 2025 decision, the named plaintiffs originally included two former Coast Guard Reservists. Their claims were voluntarily dismissed because "they were not participating in full-time active duties at the time of their alleged unlawful separations and, thus, did not satisfy the jurisdictional requirements of the Military Pay Act, 37 U.S.C. §§ 204(a)(2) & 206(a)(1)." *Harkins*, 174 Fed. Cl. at 594 n.1 (citing *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999)).

following the denial of their religious accommodation requests, 173 Coast Guardsmen who received an administrative exemption or waiver in lieu of a religious accommodation, and 904 Coast Guardsmen who received no exemption or accommodation but remained on active duty. To each notice, the Coast Guard appended an administrative claim form drafted jointly by the parties and a copy of the Court's January 23, 2025 decision. The notices invited recipients to submit an administrative claim for a records correction and consequent administrative and monetary relief.[2, 3]  As provided in RCFC 52.2(b)(1)(A), the Court provided detailed instructions for the Coast Guard to follow when evaluating individual claims. The Court directed the Coast Guard to complete the remand proceedings within six months in accordance with RCFC 52.2(b)(1)(B), noting that the September 9, 2025 deadline could be extended for good cause under RCFC 52.2(c)(1).

I.      Remand Extension

On September 12, 2025, the government filed its most recent status report in accordance with RCFC 52.2(b)(1)(D). Included in the government's filing is a request to extend the remand period by an additional fifty-nine days, until November 7, 2025. ECF 79. Plaintiffs registered their general opposition to the request but did not file a formal response explaining why. For good cause shown, defendant's motion to extend the remand period is granted. In light of the current government shutdown—caused by the October 1, 2025 lapse in federal appropriations—the requested deadline is extended an additional thirty-one days, until December 8, 2025.

To date, the Coast Guard has preliminarily decided to award constructive service and consequent benefits to plaintiffs Christopher D. Harkins and Matthew W. Powers. Mr. Harkins is expected to receive one year of constructive service from his December 1, 2022 separation date, presumably making him eligible for a previously approved—and forfeited—twenty-year retirement. Mr. Powers, in turn, is expected to receive over seven months of constructive service, from his November 14, 2022 separation date to his June 20, 2023 return to the Coast Guard as a civilian employee. The Coast Guard also submitted a group application to the Coast Guard Board for Correction of Military Records (BCMR) on behalf of fifty-nine service members who have returned to military service. This group includes plaintiffs Chief Petty Officer Shane R. Nolan and recently promoted Chief Petty Officer Mark A. Byrd, as well as thirteen of the forty-four Coast Guardsmen who submitted an administrative claim

---

[2] The Coast Guard served the notices by electronic mail and certified United States mail to each current and former Coast Guardsman's last known email and physical mailing address. To limit confusion, the Coast Guard endeavored to coordinate messaging regarding both the Court's decision and the President's Executive Order.

[3] In addition to the correction of military records, potential relief includes, but is not limited to: retroactive reinstatement and related benefits based on constructive service, retroactive promotion or promotion consideration, specialty pay, administrative separation boards, reenlistment boards, separation pay, medical treatment (i.e., actual or expense reimbursement), and repayment of forfeited reenlistment bonuses.

in response to the notices discussed above. Presumably, the Coast Guard is proposing that the fifty-nine Coast Guardsmen "receive full back pay, benefits, bonus payments, or compensation," consistent with the Executive Order.[4]  Additionally, the Coast Guard's Return2Service Team is reportedly in discussions with thirty-two more former service members regarding their possible reenlistment and recall to active duty and consequent back pay and related benefits.

## II.    Class Certification

Against this backdrop, plaintiffs seek to certify a class and two subclasses of current and former Coast Guardsmen pursuant to RCFC 23.  The proposed class would consist of:

> [The six named plaintiffs] and all current and former Coast Guard members who were discharged, separated, constructively discharged, involuntarily transferred to inactive status, and/or denied pay or benefits due to their unvaccinated status with respect to Defendant's COVID-19 Vaccine Mandate, and as a result lost pay, benefits, retirement points, training, promotion, or any other emoluments to which they are entitled . . . .

ECF 69 at 1.  The first proposed subclass—labeled the "exemption requested subclass"—would consist of all putative class members who, before separating from the Coast Guard due to their unvaccinated status, "submitted a Religious Accommodation Request, a request for an administrative exemption, or a request for a medical exemption to the requirements of the COVID-19 Vaccine Mandate . . . ." *Id.* at 1–2.  The second proposed subclass—identified as the "voluntary separation subclass"—would consist of all putative class members "who 'voluntarily' separated from [military] service rather than comply with the COVID-19 Vaccine Mandate . . . ." *Id.* at 2.  For the following reasons, plaintiffs' motion is denied.

### A. Mootness

The Court first addresses the propriety of including Coast Guardsmen who voluntarily separated from military service in the putative class and subclasses.[5]  As the Court explained in its January 23, 2025 opinion with respect to named plaintiffs Aaron Gutierrez and Christopher S. Musgrave, "in electing to voluntarily separate from the military rather than face a disciplinary discharge or administrative

---

[4] The Coast Guard reports that the service continues to consider the administrative claims submitted by fifteen former Coast Guardsmen.  The Court surmises that some or all of the remaining sixteen administrative claims were submitted by service members who voluntarily separated from the Coast Guard and are thus not entitled to relief under this Court's January 23, 2025 decision.

[5] As defined by plaintiffs, voluntarily separated Coast Guardsmen comprise the entirety of the voluntary separation subclass and are included in the putative class and the exemption requested subclass.

separation, plaintiffs . . . forfeited their rights to seek legal redress in this Court." *Harkins*, 174 Fed. Cl. at 609 ("[I]f a plaintiff cannot establish that he is currently on active duty, he must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of [37 U.S.C.] § 204, or else his claim falls for failure to state a claim upon which relief can be granted." (citing *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006))). Since Messrs. Gutierrez and Musgrave do not have cognizable claims, any request to certify a class or subclass of or including similarly situated service members is moot as to those claimants.[6] *Charleston Area Med. Ctr., Inc. v. United States*, 940 F.3d 1362, 1372 (Fed. Cir. 2019) (citing *Greenlee Cnty. v. United States*, 487 F.3d 871, 880 (Fed. Cir. 2007) (collecting cases)). Accordingly, plaintiffs' motion for class certification is moot insofar as it seeks certification of the voluntary separation subclass and would include voluntarily separated Coast Guardsmen in both the putative class and the exemption requested subclass.

B. Rule 23

Class actions are limited exceptions to the axiom that litigation is prosecuted "by and on behalf of" the named parties to a lawsuit. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Under RCFC 23(a), the prerequisites for class certification are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

RCFC 23(a). To maintain a class action, subsection (b) further requires showing that

---

[6] The Court's March 13, 2025 remand order directed the Coast Guard to "maintain a file of any administrative claims submitted [by voluntarily separated service members] and include the data in [the post-remand] final report . . . ." ECF 57 at 4. The stated purpose: "to facilitate their participation in any post-remand class certification or joinder proceedings as well as any appeal to the United States Court of Appeals for the Federal Circuit challenging this Court's waiver ruling . . . ." *Id.* Notice to all 274 Coast Guardsmen who separated from military service—either voluntarily or involuntarily—following the denial of their religious accommodation requests ensured the review of any challenged basis for separation. To this end, the Court invited, but explicitly did not require, the Coast Guard to "review and adjudicate any claims of current or former Coast Guardsman found to have voluntarily separated from the service rather than face a disciplinary discharge or administrative separation." *Id.* Absent a reversal of this Court's waiver ruling, there is no basis in law or fact to certify a subclass of claimants not entitled to relief or to include such claimants in the proposed class or other subclass.

the United States has acted or refused to act on grounds generally applicable to the class[,] . . . that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

RCFC 23(b)(2)–(3). Factors to be considered in resolving the "superior[ity]" portion of that analysis include: "the class members' interests in individually controlling the prosecution of separate actions; . . . the extent and nature of any litigation concerning the controversy already begun by class members; . . . and . . . the likely difficulties in managing a class action." RCFC 23(b)(3)(A)–(D).

Despite the similarities between RCFC 23 and Federal Rule of Civil Procedure 23, the bar for class certification is substantially higher in this Court than in federal district court. All seven requirements enumerated in RCFC 23 are written in the conjunctive, whereas the requirements to maintain a class action under Federal Rule of Civil Procedure 23(b) are written in the disjunctive. *Compare* RCFC 23(a)–(b) (requirements linked by "and"), *with* FED. R. CIV. P. 23(b) (requirements linked by "or"); *see Oztimurlenk v. United States*, 162 Fed. Cl. 658, 672 (2022). Consequently, failure to satisfy any prong in this Court is fatal. *Arnhold v. United States*, 166 Fed. Cl. 499, 505 (2023) (citing *Horvath v. United States*, 149 Fed. Cl. 735, 745 (2020)). To prevail, plaintiffs must prove by preponderant evidence that each requirement is met: numerosity, commonality, typicality, adequacy, general applicability, predominance, and superiority. *Bauer v. United States*, 176 Fed. Cl. 240, 247 (2025) (citing *Oztimurlenk*, 162 Fed. Cl. at 673 (quoting *Wal-Mart*, 564 U.S. 350)). "In determining whether plaintiffs have carried their burden, the Court must conduct a 'rigorous analysis' and thus may be required to 'probe behind the pleadings' to assess plaintiffs' showing." *Id.* (first quoting *Wal-Mart*, 564 U.S. at 350–51; and then citing *Oztimurlenk*, 162 Fed. Cl. at 673).

### 1. Numerosity

The number of putative plaintiffs in a proposed class is the logical starting point in evaluating whether the numerosity requirement is met. *See Common Ground Healthcare Coop. v. United States*, 137 Fed. Cl. 630, 638 (2018) (first citing *King v. United States*, 84 Fed. Cl. 120, 124 (2008); and then citing *Fauvergue v. United States*, 86 Fed. Cl. 82, 96 (2009), *rev'd and remanded on other grounds sub nom.*, *Bright v. United States*, 603 F.3d 1273 (Fed. Cir. 2010)). Yet RCFC 23 neither identifies nor suggests a specific number of class members as sufficiently numerous.[7] Indeed, this Court has found a class of fewer than two dozen potential

---

[7] Efforts to adopt a presumptive metric to resolve this issue have been met with mixed reviews. *Contrast King*, 84 Fed. Cl. at 124 ("While not outcome determinative, the number of potential class members is persuasive when determining numerosity: generally, if there are more than forty potential class members, th[e] [numerosity] prong has been met." (citing *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001))), *with Bell v. United States*, 123 Fed. Cl. 390, 397 (2015) (citing *Jaynes v. United*

plaintiffs sufficiently numerous but a putative class exceeding 1,200 members insufficiently numerous.  *See Bauer*, 176 Fed. Cl. at 249 (collecting cases).

In any event, the Court has no occasion to evaluate whether a specific number of class members is sufficiently numerous in this case.  While plaintiffs need not identify an exact number of potential class members, they must at least identify a "legally definable class that can be ascertained through reasonable effort."  *Jones v. United States*, 118 Fed. Cl. 728, 733 n.2 (2014) (first citing *Simer v. Rios*, 661 F.2d 655, 669–71 (7th Cir.1981); and then citing *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D.Pa.1995)), *quoted in Oztimurlenk v. United States*, 162 Fed. Cl. 658, 675 (2022).  Here, plaintiffs seek to include *all* current and former Coast Guardsmen whose military careers and related pay and benefits *may* have been impacted in *any* way by the now-rescinded COVID-19 vaccine mandate, regardless of whether they submitted a religious accommodation request and, if they did, regardless of whether their religious accommodation request was addressed by the Coast Guard.  Even the proposed exemption requested subclass would include current and former Coast Guardsmen who sought administrative or medical exemptions or waivers— as opposed to religious accommodation requests—again, regardless of whether their requests were ever adjudicated.[8]  Both groups are amorphous, and plaintiffs have not offered estimates of their sizes.  By painting with exceptionally broad strokes in an effort to capture every conceivable claimant—whatever their circumstances relative to the COVID-19 vaccine mandate—plaintiffs frustrate any meaningful effort to numerically capture the true universe of a cognizable class membership roster.

A more reasonably defined putative class might consist of all Coast Guardsmen involuntarily separated following the denial of their religious accommodation requests.  *Cf., e.g., Doster v. Kendall*, 342 F.D.R. 117 (S.D. Ohio) (certifying class of United States Air Force members who submitted religious accommodation requests in response to the COVID-19 vaccine mandate), *modified*, No. 22-84, 2022 WL 2974733 (S.D. Ohio July 27, 2022), *aff'd*, 54 F.4th 398 (6th Cir. 2022), *reh'g and reh'g en banc denied*, 65 F.4th 792 (6th Cir.), *cert. granted and vacated as moot*, 144 S. Ct. 481 (2023).  This putative class would be a subgroup of the 274 current and former service members identified by the government as having separated from the Coast Guard—either voluntarily or involuntarily—following the denial of their religious accommodation requests.  But even this tailored roster likely would not satisfy the numerosity requirement, as the linchpin of this inquiry is the impracticality of joinder.  RCFC 23(a)(1).  The Court doubts that joinder of everyone in this subgroup would be impracticable.

---

*States*, 69 Fed. Cl. 450, 454 (2006)) (declining to adopt presumptive approach to numerosity). Considering the breadth of cases falling within this Court's jurisdiction, any presumptive measure of numerosity would be as impractical as it would be arbitrary.

[8] Given the mootness ruling, *supra*, the Court need not address the size of the proposed voluntary separation subclass.

While a more lenient numerosity analysis might be warranted where the claims at issue are so small that the cost of litigation outweighs the potential relief, that is not the situation here. Case in point: Mr. Harkins is now poised to recover one year of constructive service back pay and related benefits, as well as a previously forfeited twenty-year regular retirement. Mr. Harkins is not an outlier. Mr. Powers is slated to receive seven months of constructive service back pay and related benefits between his separation and his reemployment as a civilian employee. Chief Petty Officers Nolan and Byrd are similarly poised to recover months of constructive service back pay and related benefits between the dates of their respective separations and reenlistments. On this issue, plaintiffs' complaint posits: "There are at least 1,000[] Class Members, the majority of which have a claim in the range of $10,000 to $100,000." ECF 17 at 54. Such potential recoveries belie any argument that individual claims are prohibitively costly to pursue. *See Lohmann v. United States*, 154 Fed. Cl. 355, 372 (2021) ("Plaintiffs contend that some proposed class members could have very large claims that amount to more than $50,000 or even $100,000— an amount that does not strike this Court as 'too small to justify being brought individually.'" (quoting *Curry v. United States*, 81 Fed. Cl. 328, 338 (2008))).

This Court need not further engage in the academic exercise of postulating the potential size of a cognizable class for purposes of determining whether the numerosity requirement is satisfied. Plaintiffs bear that responsibility. In any case, the Court is not convinced that joinder is impracticable. As explained *supra*, the Coast Guard attempted to notify and invite all 1,351 current and former Coast Guardsmen potentially impacted by this Court's January 23, 2025 decision to file an administrative claim for relief. Any individual dissatisfied with the assessment of their claim, including any relief awarded, may appeal to this Court at the conclusion of the remand proceedings. Considering the uniqueness of each current and former service member's potential claims—as exhibited by the facts presented by the six named plaintiffs—permissive joinder appears to be the more prudent approach. At bottom, resolution of the numerosity issue is unnecessary to decide plaintiffs' motion for class certification. Instead, the Court turns to the remaining requirements under RCFC 23, taking into account the class and subclass memberships plaintiffs propose.

### 2. Commonality

To qualify as a common question of law or fact under RCFC 23(a)(2), a question must be "central to the validity of each one of the claims" and "of such a nature that it is capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. That is, a common question of law or fact is a question whose resolution determines, at least in part, the rights of *every* member of a putative class. If a question of law or fact is relevant to most—but not all—members of a proposed class, the commonality requirement is not met. *See, e.g.*, *Bauer*, 176 Fed. Cl. at 254 (question applicable to "vast majority" but not all putative class members did not satisfy commonality requirement).

8

Plaintiffs assert that three questions the Court answered in its January 23, 2025 decision are "common" within the meaning of RCFC 23(a)(2).[9]  First, whether the Coast Guard erred in conflating Emergency Use Authorization (EUA) vaccines with U.S. Food and Drug Administration (FDA)-approved vaccines in seeking to sidestep the informed consent requirement codified at 10 U.S.C. § 1107a(a)(1).  *Harkins*, 174 Fed. Cl. at 601–06 (conflation of EUA vaccines with FDA-approved vaccines legally improper).  Second, whether the Coast Guard's practice of summarily denying religious accommodation requests violated the strict scrutiny standard applicable to governmental restrictions on individuals' free exercise rights under RFRA.  *Harkins*, 174 Fed. Cl. at 606–09 (rote denials of religious accommodation requests do not pass constitutional or statutory muster).  Third, whether the Coast Guard's decision to administratively separate service members for the convenience of the government (i.e., unavailability for worldwide deployment due to immunization status)—rather than prosecute violations of Articles 90 and 92(2) of the UCMJ for refusing or failing to comply with the COVID-19 vaccine mandate—"falls with the general authority 'otherwise provided by law' sanctioned in 10 U.S.C. § 1169(3)."  *Harkins*, 174 Fed. Cl. at 606 (Coast Guard acted within statutory authority when separating service members for convenience of government due to unvaccinated status and consequent unavailability for worldwide deployment (citing *Tippins v. United States*, 93 F.4th 1370, 1377–78 (Fed. Cir. 2024))).

None of these questions apply uniformly across the proposed class or subclasses, as RCFC 23(a)(2) requires.  Mr. Powers, for example, was reportedly offered an FDA-approved vaccine at a designated military medical clinic in June 2022, thereby obviating the need to resolve the § 1107a(a)(1) informed consent issue in his case.  *Harkins*, 174 Fed. Cl. at 600, 602 n.25.  As defined, plaintiffs' proposed class and subclasses would include Coast Guardsmen who, like Mr. Powers, had access to FDA-approved vaccines and for whom the § 1107a(a)(1) issue is not implicated.  Plaintiffs' proposed class and subclasses would also include Coast Guardsmen who did not submit a religious accommodation request and for whom RFRA is not in issue.[10]  The proposed class and subclasses would further include Coast Guardsmen who were not separated for the convenience of the government and to whom the § 1169(3) issue does not apply.  Put simply, none of the three questions plaintiffs proffer as "common" qualify as such under RCFC 23(a)(2).

---

[9] Plaintiffs' general inference that there are common questions inherent in the Court's January 23, 2025 decision beyond the three discussed in their motion for class certification is insufficient to meet their burden on this issue.  *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'" (first quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir. 1991); and then citing *Int'l Raw Materials v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n.11 (3d Cir. 1992))), *quoted in SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

[10] The putative class and voluntary separation subclass make no reference to the submission of a religious accommodation request.  The exemption requested subclass, in turn, includes Coast Guardsmen who filed requests for administrative and medical exemptions and waivers, and further does not require a Coast Guard denial.

By overstating the reach of the Court's rulings, plaintiffs elide material differences between members of the putative class and subclasses. The consequence: there are current and former Coast Guardsmen in the defined putative class and subclasses whose rights are unaffected by the questions plaintiffs maintain are "common." Plaintiffs have thus failed to carry their burden to demonstrate commonality for the proposed class and subclasses.

### 3. Typicality

Typicality requires that the claims of the named plaintiffs and those of absent class members "stem from a single event or unitary course of conduct, or . . . are based on the same legal or remedial theory." *Bauer*, 176 Fed. Cl. at 254 (quoting *Geneva Rock Prods., Inc. v. United States*, 100 Fed. Cl. 778, 790 (2011)). This requirement "assures that the claims of the named plaintiffs are similar enough to the claims of the class so that the representative[s] will adequately represent them." 7A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1764 (4th ed. 2025) (discussing typicality requirement of FED. R. CIV. P. 23(a)(3)). Although the burden of proof is "not high," *Bauer*, 176 Fed. Cl. at 255 (quoting *Brown v. United States*, 126 Fed. Cl. 571, 585 (2016)), typicality is not shown where, as here, "the legal or factual position of the representatives is markedly different from that of other members of the class . . . ." WRIGHT & MILLER, *supra*.

The narrow factual and legal circumstances presented by the named plaintiffs are incongruous with the broad class and subclasses they seek to represent. Each named plaintiff submitted a religious accommodation request from the COVID-19 vaccine mandate. Following the formal denials of those requests, each named plaintiff administratively separated from the Coast Guard, either voluntarily or involuntarily. In contradistinction—and as detailed above—the universe of putative class members includes Coast Guardsmen who did not submit religious accommodation requests, whose religious accommodation requests were not decisioned by the Coast Guard, and who remained on active duty. The exemption requested subclass suffers from similar overreach, seeking to include class members, for example, who requested medical and administrative exemptions and waivers rather than religious accommodations, whose medical and administrative exemptions and waivers were granted or not decisioned, and who remained on active duty. The voluntary separation subclass is also too broad. Like the putative class, this proposed subclass definitionally includes former Coast Guardsmen who either did not submit religious accommodation requests or whose religious accommodation requests, if submitted, were not decisioned. The named plaintiffs therefore fail to demonstrate that their claims are typical of the claims of the putative class members they purport to represent.

### 4. Adequacy

The adequacy prong requires two inquiries: (1) whether counsel possess the necessary subject matter expertise and experience to competently serve as class

counsel, and (2) whether the class members' interests are aligned in the litigation. *Bauer*, 176 Fed. Cl. at 255; *Horvath*, 149 Fed. Cl. at 750 (citations omitted).  There is no doubt as to the first, but there are serious questions as to the second.  On the issue of competence, counsel have demonstrated their expertise throughout this litigation, and their track record handling similar cases—including class actions—is clearly sufficient.[11]  But given plaintiffs' failure to demonstrate commonality or typicality, the Court is not persuaded that the putative class members' interests are satisfactorily aligned.  *See, e.g.*, *Bauer*, 176 Fed. Cl. a 255 ("Because Plaintiffs have not made a factual showing of commonality or typicality, I cannot find that their interests align with the rest of the class.").

### 5.  General Applicability

Next, plaintiffs must demonstrate that "the United States has acted or refused to act on grounds generally applicable to the class . . . ."  RCFC 23(b)(2).  For many of the same reasons that the commonality and typicality requirements are not met, the Court is skeptical that the United States acted on grounds generally applicable to the putative class and subclasses.  To the contrary, the record reflects that the Coast Guard denied certain religious accommodation requests, failed to decision others, and granted select administrative and medical waivers.  Further, plaintiffs have not identified any evidence concerning the Coast Guard's treatment of putative class and subclass members who did not submit a request for an accommodation, exemption, or waiver.  Nor have plaintiffs shown that the Coast Guard reached uniform or even similar dispositions for the putative class members.  Some, like the named plaintiffs, were separated from the Coast Guard (either voluntarily or involuntarily), while others remained on active duty.  In light of the disparate circumstances represented by the overbroad putative class and subclasses, the Court cannot find that the government took "generally applicable" action with respect to the proffered class representatives and absent class members, as required under RCFC 23(b)(2).

### 6.  Predominance

In addressing this prong, the issue is whether any common questions of law or fact predominate over questions affecting individual members of the proposed class or subclasses.  RCFC 23(b)(3).  As explained *supra*, plaintiffs have not identified any common question of law or fact apropos of the proposed class or subclasses.  Further, as this Court recently observed:

---

[11] Counsel have decades of combined experience serving in the military, including the Judge Advocate General's Corps, as well as litigating military back pay cases and class actions.  In addition to the detailed experiences cited in counsels' declarations, the Court takes judicial notice of the fact that lead counsel authored a book about his experiences in these fields.  DALE F. SARAN, UNITED STATES V. MEMBERS OF THE ARMED FORCES: THE TRUTH BEHIND THE DEPARTMENT OF DEFENSE'S ANTHRAX VACCINE IMMUNIZATION PROGRAM (2020).

To show that common issues predominate, plaintiffs must show "whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from class member to class member." If the common question requires a "detailed, highly individualized inquiry" in order to answer it for each plaintiff, then the predominance requirement is unmet and class certification is not appropriate.

*Bauer*, 176 Fed. Cl. at 256 (quoting *Oztimurlenk*, 162 Fed. Cl. at 692). The Court's January 23, 2025 opinion in this case illustrates the need for separate evaluations of each Coast Guardsman's individual circumstances to determine the impact, if any, of the COVID-19 vaccine mandate on their military service.

7. Superiority

Finally, plaintiffs must show that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(3); *accord Bauer*, 176 Fed. Cl. at 256 (first citing *Jaynes*, 69 Fed. Cl. at 459; and then citing *Oztimurlenk*, 162 Fed. Cl. at 694). To aid in deciding this issue, RCFC 23(b)(3) directs the Court to a non-exhaustive list of factors: (1) "the class members' interests in individually controlling the prosecution of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by class members;" and (3) "the likely difficulties in managing a class action." *Id.* The Court has pointedly observed of this requirement:

As with numerosity, the superiority requirement is an odd fit with opt-in class actions, where class litigation is so similar to joinder that it is strange to ask whether one approach is better than the other. But be that as it may, the superiority requirement is met if the prospective class representative establishes that a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

*Bauer*, 176 Fed. Cl. at 256 (cleaned up). Plaintiffs do not demonstrate that litigating this case by class action would achieve these goals.

The Court already has implemented a fair and efficient method of adjudicating this controversy by guiding the remand proceedings currently underway. Plaintiffs' characterization of the remand proceedings as an "*ad hoc* joinder approach," ECF 69-1 at 7, is inaccurate. The Court directed the Coast Guard to send tailored notices to the identified 1,351 current and former Coast Guardsmen potentially impacted by this Court's January 23, 2025 decision and invite them to submit an administrative claim for relief. Per the Court's instructions, the Coast Guard must determine in the first instance whether each claimant is entitled to relief and, if so, the nature and extent of such relief. Contrary to plaintiffs' characterization, claimants are not required to join this lawsuit.

The Court struggles to see how certifying the putative class and subclasses would be more fair or efficient than the current remand proceedings. Invoking the standard required under RFRA, the "to the person" assessment required for each military pay claim, paired with the breadth of claims the named plaintiffs seek to litigate on behalf of putative class members, undermines the contention that class certification is the superior path forward. *See Harkins*, 174 Fed. Cl. at 606–07 (quoting 42 U.S.C. § 2000bb-1(a)–(b)). In filing this action, plaintiffs rightfully challenged the Coast Guard's one-size-fits-all approach to handling their individual religious accommodation requests, *id.* at 609, yet now ask the Court to sanction an equally inappropriate one-size-fits-all resolution of their highly individualized claims. The irony is not lost on the Court.

Plaintiffs' references to certain general features of opt-in class certification (e.g., establishment of an opt-in deadline and appointment of class counsel) do not move the needle, as plaintiffs do not explain why these features would promote fairness and efficiency *in this case.* The Court, for its part, doubts that the features of class litigation would be particularly helpful to the putative class and subclass members. For example, any opt-in deadline the Court may set in a class action would carry no more force than the deadline to submit an administrative claim, which the Court has already set. Neither "deadline" alters the six-year statute of limitations for military back pay claims that begins to accrue upon a service member's discharge. 28 U.S.C. § 2501; *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) ("In a military discharge case, this court and the Court of Claims have long held that the plaintiff's cause of action for back pay accrues at the time of the plaintiff's discharge." (collecting cases)).[12]

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification (ECF 69) is DENIED, and defendant's request to extend the remand period (ECF 79) is GRANTED. The Clerk of Court is directed to CONTINUE the stay of proceedings in this matter until further order of the Court. The Coast Guard shall COMPLETE the remand proceedings in this matter by December 8, 2025. All remaining deadlines included in the March 13, 2025 Order (ECF 57) REMAIN in effect. The Clerk of Court shall SERVE a copy of this Order on the Coast Guard as follows:

---

[12] Plaintiffs' concern about the response rate to the agreed upon notices sent in connection with the remand proceedings is procedurally and substantively unavailing. By agreement, the 1,351 notices were sent by electronic mail and certified United States mail to each service member's last known email and physical mailing addresses. If the Court were to certify a class, RCFC 23 would require no more. *See* RCFC 23(c)(2)(B) ("The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means."). Moreover, the response rate to date appears on par with those of typical class actions. *See* U.S. FED. TRADE COMM'N, CONSUMERS AND CLASS ACTIONS: A RETROSPECTIVE AND ANALYSIS OF SETTLEMENT CAMPAIGNS 11 (2019) ("Across all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (i.e., cases weighted by the number of notice recipients) was 4%.").

Kevin E. Lunday
Acting Commandant
U.S. Coast Guard
Commandant (CG-LCL) — Stop 7213
2703 Martin Luther King Jr. Avenue, SE
Washington, DC 20593-7213

It is so **ORDERED**.

Armando O. Bonilla
Judge

14